## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, *ex rel.* KRIS W.
KOBACH, Attorney General,

     Plaintiff,

     v.

SNAP INC.,

     Defendant.

Case No. 5:25-cv-04109

## DEFENDANT SNAP INC.'S NOTICE OF REMOVAL

Defendant Snap Inc. ("Snap") respectfully gives notice of the removal of the above-captioned action from the District Court of Washington County, Kansas, to the United States District Court for the District of Kansas pursuant to 28 U.S.C. §§ 1367, 1442, and 1446. Removal is warranted under 28 U.S.C. § 1442(a)(1), which permits removal by "any person acting under [any] officer[] of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." In support, Snap provides this short and plain statement of the grounds that entitle it to removal, as required under 28 U.S.C. § 1446(a).[1]

### I.  Factual Background

1.  On September 23, 2025, the Office of the Attorney General for the State of Kansas (the "State") filed under seal its Petition ("Pet.") in the District Court for Washington County, Kansas, in Kansas's 12th Judicial District, Case No. WS-2025-CV-000015.

2.  Snap was formally served with the summons and Petition on October 23, 2025.

---

[1] In filing this Notice, Snap does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

81435150.v1

3.      The State brings this four-count action under the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.* (the "KCPA").

4.      Count I of the Petition alleges that Snap engaged in deceptive practices in violation of the KCPA through the advertising, marketing, and promotion of its platform by making willful misrepresentations related to the age ratings displayed in phone application stores and the prevalence of profanity, sexual content, drug content, and other "mature" content on the platform.

5.      Count II of the Petition alleges that Snap engaged in unconscionable acts in violation of the KCPA through the advertising, marketing, and promotion of its platform by making willful misrepresentations related to the age ratings displayed in phone application stores and the prevalence of profanity, sexual content, drug content, and other "mature" content on the platform.

6.      Count III of the Petition alleges that Snap engaged in deceptive practices in violation of the KCPA through the willful concealment, suppression, or omission of material fact related to its platform's addictive nature and risks of psychological harm posed to children.

7.      Count IV of the Petition alleges that Snap engaged in unconscionable acts in violation of the KCPA through the design, advertising, marketing, and promotion of its platform by including features that create addiction in young people, compelling children to agree to Snap's terms of service, and making of misrepresentations and omissions concerning the safety of Snap's platform.

8.      The State's claims threaten to interfere with Snap's ability to carry out its responsibilities under federal officers, including officers from the U.S. Department of Homeland Security ("DHS") and the U.S. Food and Drug Administration ("FDA").  Those agencies work

with Snap to ensure that important public service messages reach 13- to 17-year-olds on Snap's platform, Snapchat, including in ways alleged by the State to violate the KCPA.

9.    The State's claims seek to penalize Snap for conduct which includes its work assisting the federal government in accomplishing its goals of reaching teenage audiences, and the State's requested injunctive relief would necessarily impair Snap's ability to facilitate the federal government's messaging to those target audiences.

10.    Snapchat is an important platform for federal agencies to utilize when carrying out their duties to engage with teen audiences and disseminate critical health, safety, and well-being messaging.  Snapchat has a broad reach among teenagers, and it permits teenagers starting at age 13 to sign up for its services.  According to the Petition, "millions of young people in the United States" have Snapchat accounts, including more than half of the country's teenagers.  Pet. ¶ 36. Federal agencies seeking to reach teenagers on important issues of health, safety, and well-being engage with Snap to use its platform in order to reach a substantial share of their targeted audience.

**A.  Department of Homeland Security Know2Protect and Pledge2Protect Campaigns**

11.    Snap assists DHS as part of the Know2Protect and Pledge2Protect campaigns, with Know2Protect being the first-of-its-kind federal campaign dedicated to educating teenagers and adults about online safety risks and specifically preventing online sexual exploitation and abuse. Pledge2Protect is the official call-to-action for Know2Protect, which encourages people, including minors, to take action and educate themselves concerning online child exploitation and preventative measures.

12.    DHS carries out these campaigns in furtherance of its child exploitation prevention responsibilities under 6 U.S.C. § 473.  DHS's public communications about the Know2Protect campaign explain that the agency engaged Snap specifically because of its ability to "spread

awareness to one of the campaign's key audiences: teens" and to engage teens "directly" on a platform that "resonates strongly with teens."  DHS, *DHS Know2Protect and Snap Inc. Launch Innovative Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ("DHS Press Release").[2]  DHS also publishes a "social media toolkit," which explains how people, including minors, can use online platforms like Snapchat to inspire each other to take the Pledge2Protect and share it with others "far and wide" to create "a ripple effect of awareness, action and change" and "a wave of safety in the digital world."  DHS, *Know2Protect Social Media Toolkit* (last updated Aug. 12, 2025).[3]

13.    Since 2024, Snap has entered into Memoranda of Understanding ("MOUs") with the Child Exploitation Investigations Unit of DHS's Cyber Crimes Center.  These MOUs set the framework for Snap's efforts in assisting DHS with the development, scaling, and promotion of the Know2Protect and Pledge2Protect campaigns.

14.    Snap has assisted DHS with the Know2Protect and Pledge2Protect campaigns by conducting research on young adults' awareness of and familiarity with various risks of child sexual exploitation and abuse online, including research focused on teens aged 13 to 17.  This research helps inform the development and operation of the federal government's campaign.

15.    DHS furthers its goals by "leveraging Snapchat's interactive features."  DHS Press Release.  For example, pursuant to the MOUs, Snap assisted DHS with building two custom "lenses" (one for each campaign), which are Snapchat features that allow users to add interactive animations to photos and videos.  The Know2Protect and Pledge2Protect lenses are features unique to Snapchat that are available to Snapchat users around the country, including Kansas residents.

---

[2] Available at https://perma.cc/6LEW-277X.
[3] Available at https://perma.cc/F6JG-SCCG.

81435150.v1

16.    The Know2Protect lens "is designed to engage teens through a fun and interactive quiz" that asks questions about online safety and how to prevent online harm. *Id.* The Know2Protect lens makes this educational process "an entertaining adventure": users can create videos of themselves taking the quiz, use Snapchat's other interactive features to add effects, animations, and personalization to their video, and then share their video with friends and family. *Id.* Through the Know2Protect lens, DHS explains that it can "bring important online safety information to [the teen] community directly." *Id.*

17.    The Pledge2Protect lens dresses users' personalized avatars (known as "Bitmojis") in a custom t-shirt that reads "Take the Pledge2Protect" and includes the Pledge2Protect campaign logo and the web address for the Know2Protect website. Users who take the pledge are encouraged to use the lens to share their dressed Bitmoji with friends or family. A QR code specific to the Snapchat platform, which brings users directly to the lens, is displayed on the Know2Protect website.[4]

18.    Snap assists both DHS and its advertising contractor to ensure the Know2Protect and Pledge2Protect projects operate according to DHS's objectives. Snap connected DHS and its contractor to a longtime production partner to build the Know2Protect and Pledge2Protect lenses for the platform. DHS's contractor coordinated directly with the production partner on lens development, revisions, and feedback cycles, while Snap and DHS met intermittently to discuss the campaigns. DHS approved the final content of the Know2Protect lens, which launched in October 2024. The Pledge2Protect lens launched in August 2025.

---

[4] Available at https://perma.cc/H9KZ-N892.

19.     Following the success of the Know2Protect lens in reaching and engaging the targeted teen audience, DHS entered into another MOU with Snap, which runs through December 2025 and includes the Pledge2Protect effort.

20.     Additionally, DHS utilizes in-app advertisements to promote Know2Protect using advertising credits provided by Snap.  DHS has used many of those credits to target teens aged 13 to 17.  DHS uses those credits to amplify the reach of the campaigns, including to promote the Know2Protect and Pledge2Protect lenses and to connect users to campaign "call to action" video advertisements that DHS produced.  DHS dictates the "placement" of the Know2Protect and Pledge2Protect advertisements by selecting where and how the advertisements are displayed on the Snapchat application.  Snap implements DHS's request to target campaigns to teen users aged 13 to 17, resulting in a high number of "impressions" (user views) among that target audience.

**B.  Department of Homeland Security Blue Campaign**

21.     Snap also facilitates the promotion of DHS's Blue Campaign, a national public awareness campaign located within the DHS Center for Countering Human Trafficking that is aimed at educating the public about the indicators of human trafficking and how to combat it.  DHS carries out this campaign in furtherance of its human trafficking prevention responsibilities under 6 U.S.C. §§ 242 and 242a.  As part of the Blue Campaign, DHS publishes materials designed to help "reach those considered vulnerable to exploitation and human trafficking: youth."  Blue Campaign, *How To Talk to Youth About Human Trafficking* 1 (June 5, 2025).[5]

22.     In 2024 and 2025, DHS utilized in-app advertisements to promote the Blue Campaign, including advertisements delivered via aspects of Snapchat alleged to be in violation of the KCPA.  DHS uses Snapchat to amplify the reach of the Blue Campaign, including by

---

[5] Available at https://perma.cc/W2PL-LEFK.

connecting users to Blue Campaign advertisements produced by DHS. DHS dictates the "placement" of the Blue Campaign advertisements by selecting where and how the advertisements are displayed on the Snapchat application. Snap also implements DHS's request to target young users, including those aged 13 to 17, resulting in a high number of impressions among that target audience. Most recently, Snap implemented the Blue Campaign's 2025 back-to-school initiative to increase awareness around human trafficking, including by targeting teen users aged 13 to 17.

### C. Food and Drug Administration Public Health Campaigns

23.     In 2019, Snap began assisting the FDA with implementing the Center for Tobacco Products's public health campaigns, many of which target teen audiences aged 13 to 17. The FDA's Center for Tobacco Products utilizes Snap to fulfill its statutory duties to reach teen users with important messages about the risks of vaping and cigarette use. 21 U.S.C. §§ 387a(e), 393(d)(2)(D).

24.     These Center for Tobacco Products public health campaigns include "The Real Cost" and "Next Legends." The Real Cost campaign seeks to reach U.S. teenagers, including teenagers under the age of 18, with public health messages about the risks of tobacco and nicotine use. The FDA specifically engages platforms like Snapchat because it recognizes that frequent engagement with youth through the internet "helps broaden the campaign's reach and creates spaces for teens to engage in peer-to-peer conversations about tobacco use in ways that are authentic to who they are." The Center for Tobacco Products, *The Real Cost: Campaign Overview* 2 (Jan. 2018).[6] The Next Legends campaign was designed to educate American Indian/Alaska Native teenagers, including those under the age of 18, about the harms of vaping.

---

[6] Available at https://perma.cc/7UE8-4P4U.

25.     Snap assisted the FDA with building multiple custom The Real Cost and Next Legends lenses, which, like the Know2Protect and Pledge2Protect lenses, are features unique to Snapchat that are available to Snapchat users around the country, including Kansas residents. These interactive lenses have animations which provide facts about the dangers of cigarette and vape use when users engage with the lens.  Users can create a video of themselves using the lenses, use Snapchat's other interactive features to add effects, animations, and personalization to their video, and then share their video with friends and family.

26.     The FDA has also utilized in-app advertisements to promote initiatives like The Real Cost and Next Legends.  Snap assists the FDA with amplifying the reach of its public health campaigns to teenage audiences, including by connecting users to photo and video advertisements produced by the FDA.  The FDA dictates the "placement" of these advertisements by selecting where and how the advertisements are displayed on the Snapchat application.  Snap also implements the FDA's request to target in-app advertisements to teen users aged 13 to 17.

27.     The FDA contracts with a media agency to coordinate its public outreach campaigns on Snapchat.  The media agency operates the FDA's account on Snap's advertiser platform and has agreed to the self-serve advertiser platform contract on behalf of the FDA.  The FDA, through its media agents, sends detailed campaign briefs to Snap that outline the agency's campaign goals and objectives.  During active FDA campaigns, Snap meets with the FDA's media agency to ensure the campaign performs according to these goals and objectives.  These meetings also serve as an opportunity for Snap to receive client feedback on how to better assist the FDA in reaching its campaign goals.

81435150.v1

## II.    Removal Standard

28.    "A civil action . . . that is commenced in a State court . . . may be removed by [a defendant] to the district court of the United States for the district and division embracing the place wherein it is pending" when it is "against or directed to" "any person acting under [an] officer[] of the United States or of any agency thereof . . . for relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).

29.    A removing defendant must, within thirty days of service of the initial pleading, file a notice of removal "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action."  28 U.S.C. § 1446(a)–(b).

## III.    Venue

30.    Removal to this Court is proper under 28 U.S.C. §§ 1442(a) and 1446(a) because this Court is the United States District Court for the district in which the state court action is pending.  *See* 28 U.S.C. § 96.

31.    Under Local Rule 81.1(b)(2), Snap must file the notice of removal for this case, which was originally filed in Kansas's 12th Judicial District, in the Topeka Division of the United States District Court for the District of Kansas.

## IV.    Bases for Removal

### A. This Court Has Jurisdiction Over the State's Claims Under the Federal Officer Removal Statute

32.    Under the federal officer removal statute, a private defendant may remove a case under § 1442(a)(1) if three elements are met.  *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022).  All three elements are applied broadly because, "[u]nlike other removal statutes," the federal officer removal statute "should 'be liberally

construed to give full effect'" to the statute's "basic purpose" of "protect[ing] against the interference with federal operations . . . ." *Id.* at 1250–51 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

33.    ***First***, the defendant must show that it "acted under the direction of a federal officer." *Id.* at 1251.  The Supreme Court instructs courts to "liberally construe[]" the "broad" phrase "acting under." *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007) (internal quotation marks and citation omitted).  Defendants satisfy the "acting under" requirement where their "effort[s were] to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphasis in original).  In contrast, "simply *complying* with the law," even where a business is subject to a detailed regulatory scheme, does not satisfy the first prong under § 1442(a)(1).  *Id.* (emphasis in original).

34.    ***Second***, the claim the defendant seeks to remove must have "a connection or association with government-directed conduct." *Suncor*, 25 F.4th at 1251 (citing *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020)).  This principle is derived from the text of the federal officer removal statute, which was broadened by Congress in 2011 to allow for removal of "a civil action *relating to* an act under color of federal office." *Latiolais*, 951 F.3d at 292 (emphasis in original).  The phrase "relating to" is given broad interpretation, *id.*, and therefore "[t]he hurdle erected by this requirement is quite low," *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).

35.    ***Third***, the defendant must have "a colorable federal defense to the claim or claims." *Suncor*, 25 F.4th at 1251.  It is the "raising of a federal question" in the defendant's "removal petition that constitutes the federal law" that "support[s] Art[icle] III 'arising under' jurisdiction."

*Mesa v. California*, 489 U.S. 121, 136 (1989).  Thus, even where there is a "nonfederal cast [to] the complaint[,] the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999).  Like the other prongs of the § 1442(a)(1) analysis, the Supreme Court has explicitly "rejected a narrow, grudging interpretation" of the colorable federal defense requirement.  *Id.* (internal quotation marks and citation omitted).  Rather, a colorable federal defense need only be plausible; a defendant need not have a "sustainable defense" or to "win his case before he can have it removed."  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *United States v. Moll*, 2023 WL 2042244, at *7 (D. Colo. Feb. 16, 2023).

36.     The State's claims under the KCPA are removable based on Snap's work assisting federal agencies by delivering their public messaging to Snapchat users aged 13 through 17, most notably under DHS's Know2Protect and Pledge2Protect programs, DHS's Blue Campaign, and the FDA's public health campaigns.

### 1.  Snap Implements the Campaigns Under the Direction of Federal Agencies

37.     ***First***, Snap is "acting under" DHS, a federal agency, in the Know2Protect and Pledge2Protect campaigns.  DHS is statutorily required to conduct "outreach and training activities" concerning child exploitation in "collaborat[ion] with other governmental, nongovernmental, and nonprofit entities approved by the Secretary." 6 U.S.C. § 473(b)(2)(F).  Through the Know2Protect and Pledge2Protect campaigns, Snap is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS and its officers, "the federal superior."  *Watson*, 551 U.S. at 152 (emphasis in original).  Snap therefore assists DHS in efforts DHS would be statutorily required to "undertake itself in the absence of a private contract." *Suncor*, 25 F.4th at 1253.

38.     When Snap "acted under" its agreement with DHS "to perform services for the government," Snap did so with the "guidance" of DHS in order to "accomplish key government

tasks" and "make a product specially for the government's use." *Id.* DHS signed MOUs with Snap in 2024 and 2025 to guide Snap's work on the Know2Protect and Pledge2Protect campaigns. DHS controlled the content of the Know2Protect and Pledge2Protect lenses, met with Snap repeatedly during the lens development processes, and exercised final approval over the Know2Protect and Pledge2Protect lenses before launch. DHS determines how to target its advertising and promotion on Snapchat, including by selecting where on the platform its advertisements are displayed to users, and DHS has chosen to target much of its advertising with respect to the Know2Protect and Pledge2Protect programs at users aged 13 to 17.

39.    ***Second***, Snap is "acting under" DHS by assisting DHS and its officers with advertising its Blue Campaign content to the agency's chosen audience, including users aged 13 to 17. DHS is statutorily required to "operate the Blue Campaign's nationwide public awareness effort and any other awareness efforts needed to . . . prevent human trafficking" and "coordinate external engagement . . . regarding human trafficking with critical partners, including . . . corporations." 6 U.S.C. § 242a(c)(4)–(5); *see also* 6 U.S.C. § 242(e)(7) (requiring the Blue Campaign to "provide guidance and training" to DHS concerning "leveraging partnerships with . . . private sector organizations to raise public awareness of human trafficking"). When Snap works with DHS's Blue Campaign, it is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS, a federal superior. *Watson*, 551 U.S. at 152 (emphasis in original). Snap therefore assists DHS with efforts that DHS would be statutorily required to perform absent Snap's involvement.

40.    Snap's acts for the Blue Campaign were under the "guidance" of DHS and its officers. *Suncor*, 25 F.4th at 1253. DHS determines how to target its advertising and promotions on Snapchat, including by selecting where on the platform its advertisements are displayed to

users.  DHS also chooses to target campaigns on Snapchat to young users, including those aged 13 to 17, and exercises control over the contents of the Blue Campaign's advertisements.

41.    *Third*, Snap is "acting under" the FDA's federal authority by assisting the FDA and its officers with advertising the FDA's anti-smoking campaigns to the agency's chosen audience of teen users, including users aged 13 to 17.  The FDA is statutorily required to "conduct[] educational and public information programs relating to [its] responsibilities," 21 U.S.C. § 393(d)(2)(D), which include implementing the 2009 Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387a(e).  A key objective of that Act is "reducing the use of tobacco by minors" to reduce premature deaths.  Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, § 2(14), 123 Stat. 1776, 1777 (2009).  Thus, when Snap works with the FDA on its anti-tobacco public health campaigns targeting teens, Snap is acting "to *assist*, or to help *carry out*" these statutorily mandated duties and tasks of the FDA, as the federal superior.  *Watson*, 551 U.S. at 152 (emphasis in original).  In other words, Snap assists the FDA with efforts that the FDA would be statutorily required to "undertake itself in the absence of a private contract."  *Suncor*, 25 F.4th at 1253.

42.    As with its work with DHS, Snap's assistance with the Center for Tobacco Product's public health campaigns were under the "guidance" of the FDA.  *Suncor*, 25 F.4th at 1253.  The FDA provides Snap with detailed campaign briefs to guide Snap's work and determines how to target its advertising and promotions on Snapchat, including by selecting where on the platform its advertisements are displayed to users.  The FDA has chosen to target some of its campaigns on Snapchat exclusively to users aged 13 to 17, and the FDA exercises control over the contents of its campaigns and its interactive lenses.  Additionally, Snap's frequent meetings with

13

the FDA's media agency during active campaigns ensure that the campaign is guided by the FDA's feedback.

### 2. The State's KCPA Claims Are Connected to Government-Directed Conduct

43.    The State's KCPA claims relate to, and have a clear connection and association with, Snap's implementation of these federal programs.

44.    In particular, the Petition alleges that Snap violates the KCPA in part based on "Snap's choice to design Snapchat to include features known to promote compulsive, prolonged, and unhealthy use by children." Pet. ¶ 161.  According to the Petition, those features include using algorithms to recommend and deliver content to users, Pet. ¶ 124, including through Snap's "Stories," "Spotlight," and "Discover" features, Pet. ¶¶ 25, 31–32.

45.    Snap relies on these features to assist DHS and the FDA in implementing their programs, including to ensure that the federal agencies' programs reach their target audience, which includes teens under 18, and to maximize user impressions for these programs.  In some instances, the agencies affirmatively selected to have their advertisements displayed through these features.

46.    The Petition also alleges that Snap violates KCPA in part because it "hosts enormous amounts of interactive mature content."  Pet. ¶ 38.  Highlighting the grave First Amendment concerns raised by the Petition, this broad (and poorly-defined) category of content could easily be understood to reach the content of the DHS and FDA programs implemented by Snap.

47.    For instance, the Petition defines "mature/suggestive themes" to mean "complex themes that are suitable only for adult audiences," including a catchall category of "other dangerous behavior." Pet. ¶ 67.  This could easily be understood to encompass the Know2Protect,

Pledge2Protect, and Blue Campaign initiatives, including the Know2Protect and Pledge2Protect lenses, which are interactive features that include content related to the sexual abuse and exploitation of minors.

48.     The KCPA claim is also based in part on alleged "tobacco, and drug use *or references*" on Snapchat.  Pet. ¶ 49 (emphasis added).  By targeting content that merely "references" tobacco and drugs, this category encompasses certain elements of the FDA's advertisements, including interactive The Real Cost and Next Legends lenses which include content related to cigarettes, vaping, and nicotine.

### 3.  Snap's Anticipated and Well-Founded Federal Defenses Are Certainly Colorable

49.     Snap plans to raise multiple federal defenses to the State's claims under the KCPA that are plainly colorable, including defenses under the First Amendment of the U.S. Constitution and Section 230 of the Communications Decency Act (the "CDA").[7]

50.     The Petition targets certain features that can incorporate Snap's own speech, including notifications, rewards, charms, and lenses.  *See* Pet. ¶¶ 106–28.  These aspects of the State's claims are barred by the First Amendment because they seek to punish Snap for the content of its speech.  *See Moody v. NetChoice, LLC*, 603 U.S. 707, 716–17 (2024) (the First Amendment protects internet platforms that "produce their own distinctive compilations of expression" including by "mak[ing] choices about what third-party speech to display and how to display it"); *id.* at 719 ("[T]he First Amendment . . . does not go on leave when social media are involved."); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837

---

[7] Snap identifies these defenses as examples for jurisdictional purposes and reserves all rights to raise other defenses in this litigation.

(N.D. Cal. 2023); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 700–03 (N.D. Ill. 2025).

51.     The "clear purpose" of the CDA is "to encourage Internet services that increase the flow of information by protecting them from liability when independent persons negligently or intentionally use those services to supply harmful content." *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009). In furtherance of this goal, Section 230 specifically provides that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker" of content provided by a third party. 47 U.S.C. § 230(c)(1). Section 230 thus "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party." *Ben Ezra, Weinstein & Co. v. Am. Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir. 2000) (citing 47 U.S.C. § 230(e)(3)). The State's claims fall within the CDA's grant of immunity because they seek to hold Snap liable for features that make available "content created by a third party." *Getachew v. Google, Inc.*, 491 F. App'x 923, 926 (10th Cir. 2012) (citing *Ben Ezra*, 206 F.3d at 984–85). The Petition therefore attacks quintessential publishing activity protected by Section 230.

### B. This Court Has Supplemental Jurisdiction Under Sections 1442(a)(1) and 1367

52.     As Snap has explained, this Court has jurisdiction under the federal officer removal statute over all four counts of the Petition. To the extent the Court finds those statutes create original jurisdiction for only some of the four claims, however, the Court still has supplemental jurisdiction over the remaining claims under §§ 1442(a)(1) and 1367.

53.     When a defendant removes a § 1442(a)(1) case, courts exercise supplemental jurisdiction over any remaining state law claims against the defendant so as to transfer the entire "civil action." § 1442(a). "Because Section 1442(a)(1) authorizes removal of the entire action

81435150.v1

even if only one of the controversies it raises involves [acts done under] a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction." 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (rev. 4th ed. 2025).

54.     This Court can also exercise supplemental jurisdiction under § 1367, because all four counts are "so related . . . that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A state law claim "is part of the same case or controversy if it derives from a common nucleus of operative fact." *Pettigrew v. Oklahoma* ex rel. *Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213 (10th Cir. 2013) (quoting *Price v. Wolford*, 608 F.3d 698, 702–03 (10th Cir. 2010)). This standard is satisfied where, like here, the claims are premised on "the same factual allegations." *Id.* Supplemental jurisdiction "serve[s] the interests of judicial economy" and is therefore particularly warranted where "the parties are the same, the claims require much of the same evidence, and many of the same witnesses are likely necessary for [all] claims." *Jones v. Addictive Behav. Change Health Grp.*, 364 F. Supp. 3d 1257, 1264 (D. Kan. 2019).

55.     The State's four claims all arise from the same factual allegations outlined in paragraphs 1 to 135 of the Petition. At their core, each of these claims is premised on a theory that Snap knowingly deceives minor teen users and their parents about the content available on the Snapchat app, how that content is delivered to users, and the risks of harm to minor teen users. Although Counts I and II focus on the appropriateness of Snapchat's age ratings and Counts III and IV focus on alleged mental health impacts from use of Snapchat, these issues (as presented in the Petition) are inextricably intertwined. For example, the State alleges that the age ratings are deceptive because "Snapchat hosts enormous amounts of interactive mature content and facilitates dangerous activities, *in addition to having psychologically harmful features*." Pet. ¶ 38 (emphasis

added).  Further, all four counts implicate allegations concerning the way that content is delivered to Snapchat users.  *See, e.g.*, Pet. ¶ 2 (alleging that Snap recommends mature, sexual, and other content to teen users); Pet. ¶ 124 (alleging that Snap uses algorithms to recommend to teen users "content that maximizes the amount of time users spend on the platform," thereby promoting "behavioral addiction").  For instance, the State alleges that content ephemerality—described by the State as one of Snapchat's "hallmark features," Pet. ¶ 3—both enables illegal, sexual, and dangerous conduct that makes Snapchat's age ratings deceptive, Pet. ¶¶ 60, 92–94, *and* leads to addiction, Pet. ¶ 3, 115–116.

## V.    Snap Has Complied with All Procedural Requirements for Removal

56.    Snap has satisfied the procedural requirements for removal under 28 U.S.C. § 1446.

57.    As required by § 1446(a) and Local Rule 81.1, Snap is filing this Notice of Removal in the United States District Court for the District of Kansas.  The state court where this action was commenced, the District Court for Washington County, Kansas, in Kansas's 12th Judicial District, is within this federal judicial district and division.

58.    The Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.

59.    The State served the summons and the Petition on October 23, 2025, which was less than 30 days ago.  Therefore, removal is timely under § 1446(b)(1).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999).

60.    A copy of "all process, pleadings, and orders served upon such defendant . . . in such action" are attached to this Notice of Removal as Exhibits A to D, as required by 28 U.S.C. § 1446(a).[8]

---

[8] Snap intends to move to seal and redact certain filings that were filed under seal in the state court.  Snap is filing all of the publicly available pleadings with this motion, and will seek leave of Court to seal and/or redact certain filings once Snap has been able to meet and confer with the State.

61.     Pursuant to 28 U.S.C. § 1446(d) and Local Rule 81.1(c), a copy of this Notice of Removal is being served on the State's counsel and filed with the state court clerk contemporaneously with the filing of this Notice of Removal.

62.     Snap reserves all rights.  Nothing herein should be construed as a waiver or relinquishment of any of Snap's rights, defenses, or remedies.

WHEREFORE, Defendant Snap Inc. respectfully gives notice that the above-captioned litigation has been removed from the District Court for Washington County, Kansas, in Kansas's 12th Judicial District, to the United States District Court for the District of Kansas.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2(c), Defendant Snap Inc. hereby designates the United States District Court for the District of Kansas at Topeka, Kansas as the place of trial.

DATED: November 12, 2025                    Respectfully Submitted,

By: /s/ *Brian C. Fries*
    Brian C. Fries (KS #15889)
    Carrie E. Josserand (KS #18893)
    Timothy J. Hadacheck
    (*pro hac vice forthcoming*)
    LATHROP GPM LLP
    2345 Grand Boulevard, Suite 2200
    Kansas City, MO 64108-2618
    Tel: (816) 292-2000
    brian.fries@lathropgpm.com
    carrie.josserand@lathropgpm.com
    timothy.hadacheck@lathropgpm.com

Edward D. Greim (KS #21077)
Paul E. Brothers (KS #26863)
Matthew R. Mueller (KS #28499)
Katherine E. Mitra (KS #79151)
GRAVES GARRETT GREIM LLP
1100 Main Street, Suite 2700
Kansas City, Mo64105
Tel: (816) 256-3181
edgreim@gravesgarrett.com
pbrothers@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com

Jeannie S. Rhee (*pro hac vice forthcoming*)
L. Rush Atkinson (*pro hac vice forthcoming*)
Kyle Smith (*pro hac vice forthcoming*)
Elizabeth N. Brandt (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, D.C. 20004-2637
Tel: (202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
ksmith@dirllp.com
ebrandt@dirllp.com

Christine M. Ray (*pro hac vice forthcoming*)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
cray@dirllp.com

*Attorneys for Defendant Snap Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2025 a copy of the foregoing document was served via the Court's electronic filing system, and by Electronic Mail, on all counsel of record.

/s/ *Brian C. Fries*
Brian C. Fries
An Attorney for Defendant

81435150.v1