## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STATE OF KANSAS, *ex rel.* KRIS W. KOBACH, Attorney General, | ) ) ) |
| Plaintiff, | ) ) |
| | ) CASE NO.  5:25-CV-04109-DDC-GEB |
| v. | ) ) ) |
| SNAP INC., | ) ) |
| Defendant. | ) |

## ATTORNEY GENERAL'S SUPPLEMENTAL
## BRIEF REGARDING *PLAQUEMINES PARISH*

The Supreme Court's decision in *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052 (2026)—though instructive on the contours of Section 1442(a)(1)'s relatedness requirement—does not change the outcome of this action. The connection between fundamental product-design choices that permeate Snap's entire business model and two federal agencies' limited ad campaigns is too "tenuous, remote, or peripheral." *Id.* at 1061 (citation omitted). *Plaquemines Parish* has nothing to say about the acting-under requirement. Snap still cannot satisfy that necessary element of federal-officer jurisdiction because it is not "help[ing] federal officers fulfill basic governmental needs, accomplish key government tasks, or produce essential governmental products—that is, . . . stand[ing] in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022). Nor is it subject to "strict guidance or control." *Id.* Although this Court need not go further, should it decide to address the relatedness requirement, *Plaquemines Parish* confirms that the conduct that the Attorney General challenges under the KCPA is unrelated to any actions Snap purportedly took under color of federal office.

1

## ARGUMENT

### I.  *Plaquemines Parish* Expands on the Meaning of "Relating to."

*Plaquemines Parish* arose from Louisiana parishes' challenge to Chevron's coastal crude-oil production during World War II in furtherance of Chevron's aviation-gasoline refining for the war effort. Chevron had entered an avgas-refining contract with the federal government, which "paid more for avgas when the price of obtaining crude oil increased." *Plaquemines Parish*, 146 S. Ct. at 1061–62. Through regulations, the government also required the "development of plans" to maximize avgas production and "required . . . vertical-drilling methods." *Id.* at 1062. The parishes' claims against Chevron "challenge[d] Chevron's actions that allowed it to increase its production of crude oil . . . during wartime." *Id.* at 1061. They also challenged the vertical-drilling methods required by the federal government. *Id.* at 1062.

Reversing the Fifth Circuit, the Supreme Court held in *Plaquemines Parish* that the parishes' suit "implicate[d] acts by Chevron that [we]re closely connected to the performance of its federal duties." *Id.* at 1062. The Court explained that the "phrase 'relating to' sweeps broadly" and "means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* at 1060 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). The relatedness requirement does not require a direct or causal connection, so a "removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Id.* But, importantly, "'relating to' . . . is not 'so broad that it is meaningless.'" *Id.* (quoting *Rutledge v. Pharm. Care Mgmt. Ass'n* 592 U.S. 80, 93 (2020) (Thomas, J., concurring)). The phrase requires a connection "that is not 'tenuous, remote, or peripheral.'" *Id.* at 1061 (quoting *Rutledge*, 592 U.S. at 94 (Thomas, J., concurring)).

Although *Plaquemines Parish* involved claims that were sufficiently related to federal duties to satisfy the relatedness requirement, federal-officer jurisdiction does not "reach all suits with any attenuated connection to federal duties." *Id.* As an example of a suit unrelated to federal duties, the Supreme Court pointed to the D.C. Circuit's decision in *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 155 (D.C. Cir. 2023), which held that a "false-advertising suit targeting an oil company's statements to consumers about the future effects of fossil fuels on climate change did not relate to its decades-earlier production for the Government." *Plaquemines Parish*, 146 S. Ct. at 1061 (citing *Exxon Mobil*, 89 F.4th at 156). In *Exxon Mobil*, there was also no "allegation [that] the [oil companies] engaged in these misrepresentations at the behest of or in coordination with federal officers." 89 F.4th at 156. Rather, the challenged "statements . . . relate[d] broadly to climate change, rather than to any specific activities conducted by the [oil companies] in concert with the federal government." *Id.*

The Supreme Court in *Plaquemines Parish* also approvingly cited a similar Eighth Circuit decision, 146 S. Ct. at 1061, that held that energy companies' "production of military-grade fuel, operation of federal oil leases, and participation in strategic energy infrastructure . . . b[ore] little to no relationship with how they conducted their marketing activities to the general public." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023). "At most, those activities relate[d] to the general production of fossil fuels," and none of the "claims tr[ied] to hold the [e]nergy [c]ompanies liable for production activities—only marketing." *Id.*

## II. *Plaquemines Parish* Confirms that the Attorney General's Claims Do Not Relate to Any Purported Official Duties of Snap.

*Plaquemines Parish* confirms that the Attorney General's claims against Snap do not relate to any actions that Snap purportedly took under color of federal office. Indeed, as the Attorney General has previously argued, Remand.Mot.14–15, DE11, this action is like *Exxon Mobil* because

3

the Attorney General does not challenge Snap's work with the federal government or steps Snap took in furtherance of its purported federal duties. Rather, the Attorney General's KCPA claims challenge the following conduct: (1) Snap's misrepresentations about the prevalence of mature content, including profanity, sexual content, and drug content, on Snapchat and that Snapchat is rated for ages "12+" and "T for Teen," Petition ¶¶ 140, 147, DE1-1; (2) Snap's use of addictive features including infinite scrolling, push notifications, personal interactive metrics, autoplay, ephemeral content, algorithmic recommendations, and the gamification of interaction on the platform through "Charms," which contributes to behavioral addiction in adolescent users, reduced sleep quality, and worsened mental health, *id.* ¶¶ 101–28; and (3) Snap's misrepresentations about the safety of Snapchat, which induced adolescent users to enter unconscionable contractual agreements with Snap in light of the harms visited on adolescents by addictive features, *id.* ¶¶ 154– 55, 160–71. That challenged conduct is unrelated to any of the three ways that Snap contends that it acted under federal officers: (1) by conducting research regarding teen awareness of online risks, (2) by participating in the ad-design process, and (3) by hosting advertisements and providing advertising credit. *See* Snap.Surreply.3–5, DE51; Beauchere Decl. ¶ 6, DE27.

First, take Snap's research into teen awareness of online risks. Contrary to *Plaquemines Parish* where Chevron engaged in the challenged crude oil production in furtherance of its refining contracts, 146 S. Ct. at 1062, there is no evidence that Snap used addictive features to conduct research. *See* Beauchere Decl. ¶ 7, DE27 (discussing research). Nor is there evidence that connects Snap's deceptive age ratings and misrepresentations about the prevalence of mature content on Snapchat to the research. Nor is there evidence that Snap continued to permit young teens to hold Snapchat accounts in furtherance of its research.

4

The only argument that there is a connection between the research and the Attorney General's claims is that the Attorney General seeks to hold Snap liable for inducing adolescents from some of the age groups involved in the research to enter unconscionable contracts with Snap. That is too "tenuous, remote, or peripheral" a connection to establish relatedness. *Plaquemines Parish*, 146 S. Ct. at 1061 (quoting *Rutledge*, 592 U.S. at 94 (Thomas, J., concurring)). The contracts are unconscionable because of Snap's misrepresentations and addictive design—not the research. Were the fact that the Attorney General's claim involves Snap's unrelated treatment of adolescents in the research group sufficient to establish relatedness, *any* claim that touched the teenage user base of Snapchat—whether it be enforcement of data-privacy rules, consumer-protection statutes, or age-verification requirements or a tort claim premised on Snap's treatment of a specific teen user—would trigger federal-officer jurisdiction.

Second, consider Snap's purported participation in the ad-design process. Most addictive features that the Attorney General challenges were not part of the ad designs. For example, there is no evidence that the ads were designed to include infinite scrolling or personal interactive metrics. Nor is there evidence that the ads were gamified with "Charms." To be sure, both DHS and the FDA used "Lenses" for their campaigns. Beauchere Decl. ¶ 8, DE27; Goldberg Decl. ¶ 10, DE28. But they did not use Lenses in the way that the Attorney General challenges. The Attorney General alleged that Lenses that "alter the appearance of a user's skin and facial features in a manner akin to plastic surgery or other cosmetic procedures" can cause "anxiety" and lead "users to seek real-life cosmetic procedures." Petition ¶ 126, DE1-1. The Lenses that DHS and the FDA used do not fit that description. Rather than provide a cosmetic effect, the FDA's Lenses turned users into an animated pair of lungs, had users play a guessing game, or made users appear angry, tired, or dark to highlight the negative effects of vaping. Goldberg Decl. ¶¶ 11, 13, DE28; DE28-

4:2–6. Similarly, DHS's Lenses involved a true/false quiz and users' Bitmojis rather than cosmetic improvements to a user's appearance. Beauchere Decl. ¶¶ 8–9, DE27; DE27-4:2; DE27-5:2.

Even further afield is the idea that misrepresentations about the prevalence of mature content on Snapchat, its age rating, or the safety of its design are related to ad design. True, the Attorney General alleges that some of the mature content involves "[a]lcohol, tobacco, and drug use or references." Petition ¶ 49, DE1-1. But the Attorney General's other allegations confirm that this content is mature because it *promotes* substance use and is thus unrelated to the FDA's public health campaigns about nicotine. *See id.* ¶ 50 (alleging the existence of "[p]osts advertising vaping pens"). Only a misconstruction of the Attorney General's allegations could possibly connect the challenged misrepresentations with ad design.

Third, take Snap's hosting of ads. Snap's declarant asserts that Snap uses "proprietary . . . algorithms" to direct the ads to teen users. Beauchere Decl. ¶ 16, DE27. But that vague statement does not establish that Snap used infinite scrolling, push notifications, personal interactive metrics, autoplay, ephemeral content, or gamification with Charms "at the behest of or in coordination with federal officers" as part of its hosting of ads for DHS and the FDA. *Exxon Mobil*, 89 F.4th at 156. Nor does it establish that Snap misrepresented the prevalence of mature content on Snapchat, Snapchat's age rating, or its safety or unlawfully induced young teens to enter contracts with Snap "at the behest of or in coordination with federal officers." *Id.* The closest Snap's declarant comes to drawing a connection between Snap's ad hosting and the challenged conduct is that the Attorney General alleges that "Snap uses algorithms that it fine-tunes to recommend content that maximizes the amount of time users spend on the platform," Petition ¶ 124, DE1-1, and bases those algorithmic recommendations on users' locations, *id.* ¶ 13, or their activity, *id.* ¶¶ 28, 31. The Attorney General's allegations thus do not concern algorithmic recommendations based on a user's

age, so, to the extent that Snap directed ads to teen users for DHS and the FDA, it did so independently of its use of many addictive features, including algorithms that recommend content based on user behavior or location. What is more, the Attorney General challenges the overall addictive design of Snapchat, and Snap did not design its platform "at the behest of or in coordination with federal officers." *Exxon Mobil*, 89 F.4th at 156. DHS and the FDA could still reach youth on Snapchat even if Snapchat desisted in its addictive design and misrepresentations about the nature of its platform and the prevalence of mature content on it. For that reason, the ads that Snap hosts "bear[] little to no relationship with how" Snap conducts its social-media business with "the general public." *Minnesota ex rel. Ellison*, 63 F.4th at 715.

To allow the isolated use of algorithms to establish relatedness would be contrary to *Plaquemines Parish*, which focused on the "close relationship between [Chevron's] *challenged conduct* and the performance of its federal duties." 146 S. Ct. at 1061 (emphasis added). Snap's use of algorithms is like the false-advertising suit about the effects of fossil fuels on climate change in *Exxon Mobil*. Just as the plaintiff in *Exxon Mobil* did not directly challenge oil production for the government, *id.* (citing *Exxon Mobil*, 89 F.4th at 156), the Attorney General does not challenge the use of algorithms to recommend these specific ads, nor does he challenge the way in which Snap recommended these ads to young teens. The Attorney General instead challenges the overall addictive design of the platform and its effect on young teens, which bears only a remote connection to Snap's use of algorithms to host ads for the federal government in particular. To conclude that the relatedness requirement is satisfied would allow independent, isolated conduct to swallow broad allegations about Snap's general business model. *Cf. Exxon Mobil,* 89 F.4th at 156 (The challenged "statements . . . relate[d] broadly to climate change, rather than to any specific activities conducted by the [oil companies] in concert with the federal government.").

At bottom, Snap's arguments for relatedness boil down to one point: if the Attorney General prevails, there will be fewer young teens on Snapchat and thus the federal government's advertising base will be smaller. The problem with this argument is that it inverts the relatedness inquiry, which is about "relationship between [the] *challenged conduct* and the performance of . . . federal duties." *Plaquemines Parish*, 146 S. Ct. at 1061 (emphasis added). Snap instead asks this Court to consider whether hypothetical, future performance of federal duties would be affected by the Attorney General's suit. That inquiry is neither grounded in the "challenged conduct," *id.*, nor does it respect the limitation on "tenuous, remote, or peripheral" connections, *id.* (quoting *Rutledge*, 592 U.S. at 94).

## III. *Plaquemines Parish* Supports the Attorney General's Arguments Regarding the Acting-Under Requirement.

Snap may argue that the Supreme Court's rejection of an "alternative theory" in *Plaquemines Parish* changes the contours of the acting-under requirement. *Id.* at 1062. It does not. To start, *Plaquemines Parish* did not address the acting-under requirement. *Id.* at 1057 ("No party disputes that Chevron 'act[ed] under' federal officers when it performed its refining duties. We thus decide only whether this suit . . . 'relat[es] to' Chevron's wartime aviation-gasoline refining for the military."); *id.* at 1058 ("This case concerns the [relatedness] requirement."); *id.* at 1060 ("We address whether this suit . . . is 'for or relating to' Chevron's wartime refining of crude oil into avgas for the military."); *id.* at 1060 n.2 ("No party disputes that Chevron acted under a federal officer . . . . We assume, without deciding, that it did."); *id.* at 1062 n.5 ("We also do not address the other requirements of federal officer removal."); *id.* at 1062–63 ("Louisiana does not dispute that Chevron acted under a federal officer while engaged in avgas refining.").

*Plaquemines Parish* merely explained that requiring that a plaintiff have directly challenged official conduct to satisfy the acting-under requirement would render the "'relating to'

8

requirement with little, if any, independent function." *Id.* Unlike here, Louisiana did "not dispute that Chevron acted under a federal officer while engaged in avgas refining," and "the Government knew that to refine crude oil into avgas, Chevron needed crude oil," the output of which was "increased" and "maximize[d]" through contractual or regulatory requirements. *Id.* at 1058, 1062–63. Louisiana's lawsuit regarding Chevron's crude oil production thus related to the avgas refining, which Louisiana did not dispute was done under a federal officer. *Id.* at 1062–63. That holding has no bearing on what Snap must establish to have acted under a federal officer in first place.

It does not follow that *Chevron* relieves Snap of the burden to establish that it acted-under a federal officer by helping that officer "fulfill . . . basic governmental tasks." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007); *accord Suncor Energy*, 25 F.4th at 1253 Although DHS and the FDA were acting pursuant to statutory authority—as any executive agency must—when they conducted the ad campaigns, the governing statutes did not require DHS and the FDA to conduct these specific outreach programs on Snapchat. *See* 6 U.S.C. § 473(b)(2)(F); 21 U.S.C. § 393(d)(2)(D). Examples of basic governmental tasks include assisting in the performance of sovereign duties, *cf. Plaquemines Parish*, 146 S. Ct. at 1058 (wartime avgas refining); *Suncor Energy*, 25 F.4th at 1253 ("Wartime production is the paradigmatic example of this special relationship."), assisting the government where it has stepped in to provide a service in the absence of industry, *cf. Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1138 (11th Cir. 2017) (rural electrification lending), or carrying out statutorily required inspection and certification duties prior to export, *cf. Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1426–28 (11th Cir. 1996). Each of these instances involved the government enlisting the private sector to perform a task that otherwise only the government would perform. Running ad campaigns about online safety and health are not tasks unique to the federal government.

To the extent that this Court is inclined to draw conclusions about the acting-under requirement from *Plaquemines Parish*, dicta from the decision supports the Attorney General's previous arguments about why Snap cannot satisfy the acting-under requirement. *See United States v. Nixon*, 919 F.3d 1265, 1273 (10th Cir. 2019). Consistent with the Attorney General's prior argument that the acting-under requirement calls for something akin to the principal-agent relationship, Remand.Mot.3–5, DE11; Reply.5, DE45, *Plaquemines Parish* described Section 1442(a)(1) as permitting "federal officers and *their agents* to remove suits brought against them in state court." 146 S. Ct. at 1057 (emphasis added); *accord id.* at 1063 ("It contemplates removal of suits against officers or *their agents* for acts that were not done under color of their offices, so long as the suits 'relat[e] to' such acts." (emphasis added)). And consistent with the Attorney General's prior argument that the acting-under requirement requires that a removing defendant have acted under a specific officer rather than an agency or the federal government generally, Remand.Mot.9, DE11, *Plaquemines Parish* described Section 1442(a)(1) as permitting removal by the "United States, a federal agency, a federal officer, or a person 'acting under' *a federal officer*." 146 S. Ct. at 1057 (emphasis added); *accord id.* ("No party disputes that Chevron 'act[ed] under' *federal officers* . . . ." (emphasis added)); *id.* ("Congress has given federal courts jurisdiction over some suits against *federal officers* or those acting under *them*." (emphasis added)). Albeit only dicta, that dicta gives the Attorney General's arguments about the acting-under requirement further force.

## CONCLUSION

For these reasons, the Attorney General respectfully requests that this Court grant his motion to remand this action to Kansas state court.

Dated: May 15, 2026

David H. Thompson*
Brian W. Barnes*
Megan M. Wold*
Jack Tucker*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com
jtucker@cooperkirk.com

*Admitted *pro hac vice*

Respectfully submitted,

/s/ *Paul Shipp*
Paul Shipp (KS #20263)
Assistant Attorney General
Office of the Attorney General
Public Protection Division
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
Tel: 785-296-3751
Fax: 785-291-3699
paul.shipp@ag.ks.gov

*Attorneys for Plaintiff*

11

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States District Court for the District of Kansas by using the CM/ECF system on May 15, 2026. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


Dated: May 15, 2026                                    /s/ *Paul Shipp*
                                                       Attorney for Plaintiff