**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **STATE OF KANSAS, *ex rel.* KRIS W. KOBACH,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SNAP INC.,**<br><br>**Defendant.** | **Case No. 25-4109-DDC-GEB** |

**MEMORANDUM AND ORDER**

Plaintiff State of Kansas, *ex rel.* Kris. W. Kobach, sued defendant Snap Inc.[1] in Kansas state court. The suit alleges that Snap, who operates the social-media platform Snapchat, violated the Kansas Consumer Protection Act by engaging in deceptive and unconscionable practices. Before reaching the merits of this case, the court must resolve a preliminary issue: Does this case, initially filed in state court and asserting just state-law claims, belong in this federal court? Snap removed the case to this court, invoking federal-officer removal. Now before the court is Kansas's Motion to Remand (Doc. 11). The court grants it.

## I. Background

The court must accredit the removing party's plausible factual allegations contained in the Notice of Removal (Doc. 1). *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1061 (2026). The court likewise considers the Petition (Doc. 43), documents attached to the

[1] The docket lists defendant as "Snap, Inc." but the parties' filings refer to defendant as "Snap Inc." The court assumes the latter is accurate and directs the Clerk of Court to update the docket to identify the lone defendant here as "Snap Inc."

Notice of Removal, and other evidence the parties have filed on the docket. *See Doe v. Integris Health, Inc.*, 123 F.4th 1189, 1191 n.1 (10th Cir. 2024); *see also City of Brunswick ex rel. Mayor & Bd. of Comm'rs v. Honeywell Int'l*, 2026 WL 2224648, at *8 n.13 (11th Cir. Aug. 3, 2026) (published) (explaining, in federal-officer removal context, that courts "may consider evidence attached to the removal petition along with post-petition evidence to establish facts relevant to jurisdiction that existed at the time of removal"). The court thus derives the following facts from those sources.

***Petition***

Snap "operates the Snapchat social media platform, which is enormously popular among Kansas teenagers and easily accessible to teens online." Doc. 43 at 2 (Pet. ¶ 1). The Petition asserts harms falling in two buckets.

The first bucket consists of issues involving the ratings Snapchat gives itself on app stores. *Id.* at 3 (Pet. ¶ 2). Snap allegedly misrepresents the prevalence of Snapchat's mature content—including drugs, nudity, alcohol, and profanity. *Id.* at 2 (Pet. ¶ 1). And these misrepresentations result in app stores assigning Snapchat inappropriate age ratings. *See id.* at 3, 10–12 (Pet. ¶¶ 2, 38–45).

The Petition's second bucket of claims arises from Snapchat's allegedly addictive design. Kansas alleges that Snap "knowingly deceives Kansas consumers about the harms its app causes to young users." *Id.* at 3 (Pet. ¶ 3). Snap allegedly has designed Snapchat "to be addictive, especially to children and teens." *Id.* Kansas highlights Snapchat's use of "ephemeral content—content that disappears a short time after it is posted or" viewed—as a driver of addiction. *Id.* The Petition similarly decries the addictive nature of "infinite scrolling, which allows new content to constantly load, giving the appearance of an endless page." *Id.* at 26 (Pet. ¶ 106); *id.*

at 3 (Pet. ¶ 3). Snapchat's "features predictably lead to behavioral addiction among young users and result in harm to their mental and physical health." *Id.* at 4 (Pet. ¶ 5).

Kansas asserts four claims under the Kansas Consumer Protection Act. Two claims are for (1) deceptive and (2) unconscionable acts based on Snapchat's age ratings on app stores. *Id.* at 34–36 (Pet. ¶¶ 137–51). And the other two claims assert (3) deceptive and (4) unconscionable acts based on Snapchat's addictive design. *Id.* at 36–39 (Pet. ¶¶ 152–73). Kansas seeks injunctive relief and civil penalties. *Id.* at 39–40 (Pet.).

***Removal Allegations***

Snap asserts that it's entitled to remove this case based on its work for the United States Department of Homeland Security (DHS) and the United States Food and Drug Administration (FDA). Snap's assertions involve three distinct collaborations that, it argues, qualify for federal-officer removal.

*First*, Snap alleges that it assists DHS with two of its campaigns: Know2Protect, an educational campaign aiming to prevent "online sexual exploitation and abuse" and promote online safety, and Pledge2Protect, a campaign encouraging people "to take action and educate themselves concerning online child exploitation and preventative measures." Doc. 1 at 3 (Notice of Removal ¶ 11). Snap has signed Memoranda of Understanding (MOU) with DHS for both of these campaigns. *Id.* at 4 (Notice of Removal ¶ 13). On behalf of DHS, Snap has conducted "research on young adults' awareness of and familiarity with various risks of child sexual exploitation and abuse online[.]" *Id.* (Notice of Removal ¶ 14).

Snap also asserts that DHS has leveraged "Snapchat's interactive features" to advance its campaigns' goals. *Id.* (Notice of Removal ¶ 15). Specifically, Snap has helped DHS build "custom 'lenses'"—a Snapchat feature that "allow[s] users to add interactive animations to photos and videos"—for its two campaigns. *Id.* Snap did so by connecting "DHS and its

contractor to a longtime production partner to build" the lenses. *Id.* at 5 (Notice of Removal ¶ 18). Meanwhile, Snap and DHS "met intermittently to discuss the campaigns." *Id.* "DHS approved the final content of the Know2Protect lens, which launched in October 2024." *Id.* DHS also advertises on Snapchat to promote Know2Protect. *Id.* at 6 (Notice of Removal ¶ 20). DHS controls "where and how" its advertisements appear in Snapchat. *Id.* And Snap obeys DHS's request by targeting its campaigns to teenage users. *Id.*

*Second*, Snap asserts that it assists with another DHS campaign, Blue Campaign, which aims to prevent human trafficking and educate the public about human trafficking. *Id.* (Notice of Removal ¶ 21). DHS advertised Blue Campaign in Snapchat and dictated the placement of the ads. *Id.* at 6–7 (Notice of Removal ¶ 22).

*Finally*, Snap maintains that it aided the FDA with a public-health campaign. *Id.* at 7 (Notice of Removal ¶ 23). The FDA runs two such campaigns—"The Real Cost" and "Next Legends"—both of which try to educate teenagers about the risks of nicotine and tobacco use. *Id.* (Notice of Removal ¶ 24). Snap helped the FDA build custom lenses featuring interactive animations that give facts about cigarette and vape usage. *Id.* at 8 (Notice of Removal ¶ 25). "Users can create a video of themselves using the lenses, use Snapchat's other interactive features to add effects, animations, and personalization to their video, and then share their video with friends and family." *Id.* Like DHS, the FDA advertises in Snapchat to promote its campaigns. *Id.* (Notice of Removal ¶ 26). It "dictates" "where and how the advertisements" appear in Snapchat. *Id.* Snap, per the FDA's request, targets these advertisements to teenage users. *Id.*

## II. Legal Standard

"Federal courts are courts of limited jurisdiction and, as such, [they] must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

"A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). The party invoking federal jurisdiction—here, Snap—bears the burden to show that it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018) (presuming "no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction").

"The federal officer removal statute permits removal of a state action that is against 'any person acting under' an officer of the United States 'for or relating to any act under color of such office.'" *Integris Health*, 123 F.4th at 1192 (quoting 28 U.S.C. § 1442(a)(1)). "The statute's purpose is to protect the federal government from 'state-court proceedings that may reflect local prejudice against unpopular federal laws or federal officials.'" *Id.* (quotation cleaned up) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)). Private persons—including private corporations—"'who lawfully assist' federal officers" may invoke § 1442(a)(1), too. *Bd. of Cnty. Comm'rs. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022) (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)). To invoke the federal-officer removal statute successfully, our Circuit requires private defendants to show three things: "(1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Id.*; *see also Plaquemines Par.*, 146 S. Ct. at 1057–58 (similar). "Unlike other removal statutes," courts should construe the federal officer removal statute liberally "'to give full effect'" to its purpose. *Suncor Energy*, 25 F.4th at 1251 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

## III. Analysis

The thrust of Kansas's position contends that Snap wasn't "acting under" a federal officer. As Kansas tells it, no federal officer exercised sufficient control over Snap for it to qualify for removal. The court agrees. Its analysis thus begins and ends with the acting-under prong.

As the Supreme Court has explained, the "words 'acting under' are broad" and "must be 'liberally construed.'" *Watson*, 551 U.S. at 147 (quoting *Symes*, 286 U.S. at 517). "But broad language is not limitless." *Id.* The word "'under' describes a relationship between private entity and federal superior typically involving 'subjection, guidance, or control.'" *Suncor Energy*, 25 F.4th at 1251 (quoting *Watson*, 551 U.S. at 151). "Thus, a 'private person's "acting under" must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Id.* (emphases in original) (quoting *Watson*, 551 U.S. at 152). The "scope of the statute does not include simply complying with the law." *Integris Health*, 123 F.4th at 1193 (emphases omitted) (quotation cleaned up). Instead, "there must exist a special relationship between the private firm and the federal superior." *Suncor Energy*, 25 F.4th at 1251 (quotation cleaned up). The private firm must "agree to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control." *Id.* at 1253. The private actor's "closely supervised work must help the government fulfill basic government needs, accomplish key government tasks, or produce essential government products[.]" *Id.*

A "contractor is unlikely to meet the 'acting under' requirement if it sells the government an off-the-shelf commercial product or its relationship with the government is a typical, arms-length business deal." *Gov't of P.R. v. Express Scripts, Inc.*, 119 F.4th 174, 193 (1st Cir. 2024); *City and County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022) (explaining that "a typical commercial relationship" doesn't amount to "close direction"). Our Circuit, too, has

warned against interpreting the statute in a fashion that "would permit removal in countless scenarios where private parties voluntarily engage in certain conduct in exchange for payment." *Integris Health*, 123 F.4th at 1195. Indeed, only "a 'special relationship' between the private firm and the federal superior"—one involving "strict guidance or control"—can satisfy the acting-under requirement. *Suncor Energy*, 25 F.4th at 1251, 53 (quotation cleaned up).

Snap identifies three categories of tasks that, it argues, qualify it as an entity "acting under" a federal officer: (1) the federal agencies advertised on its platform; (2) Snap facilitated the creation of "lenses" for the agencies' campaigns; and (3) Snap delivered research to the DHS. Take each.[2]

**A. Advertising**

Consider the advertising argument first. Both DHS and FDA advertised their campaigns on Snapchat. Doc. 1 at 6–7, 8 (Notice of Removal ¶¶ 20, 22, 26). But placing advertisements on a social-media company's platform is hardly the sort of "strict guidance or control" that our Circuit has said will suffice. *Suncor Energy*, 25 F.4th at 1253. Instead, advertising is characteristic of an "arms-length business deal." *Express Scripts*, 119 F.4th at 193. In fact, the FDA, through an agent, placed advertising orders "on Snap's advertising platform"—just as any advertiser would. Doc. 28 at 5 (Goldberg Decl. ¶ 20). By advertising on Snapchat, the FDA agreed to "Snap's Business Services Terms." *Id.* Those very terms disclaim "any agency, partnership, or joint venture between you and Snap." Doc. 28-9 at 11. These facets of Snap's relationship with the FDA—advertisements ordered through ordinary business channels and

[2] Snap argues that it was helping DHS and the FDA discharge statutorily mandated missions. For instance, DHS has a duty to engage with nongovernmental entities to coordinate initiatives for preventing child exploitation. 6 U.S.C. § 473(b)(2). And the FDA has a duty to "conduct[] educational and public information programs relating to" its responsibilities. 21 U.S.C. § 393(d)(2)(D). The court assumes, without deciding, that Snap is correct about this point.

ordinary terms of service—show that the relationship was a standard commercial relationship—and not a "special relationship" involving "close supervision of the private entity[.]" *Suncor Energy*, 25 F.4th at 1253 (quotation cleaned up).

Snap argues that its work for DHS is unlike other customers' because it provides "DHS with significant advertising grants." Doc. 51 at 1 n.2. Snap hasn't explained why this point matters, and it thus has waived the argument. *See, e.g.*, *United States v. Moya*, 5 F.4th 1168, 1192 (10th Cir. 2021) (explaining that litigants waive arguments "when they are inadequately presented" (quotation cleaned up)); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("This briefing-waiver rule applies equally to arguments that are . . . presented only in a perfunctory manner." (quotation cleaned up)). True enough, giving away its service (for free) to DHS distinguishes Snap's relationship with DHS from an ordinary commercial relationship. But it offers scant support for the notion that DHS exercised stringent oversight. Snap hasn't provided any support for the proposition that giving away goods or services to the federal government can transform an ordinary commercial relationship into one sufficient to satisfy § 1442(a)(1)'s acting-under requirement.

Snap also asserts that the agencies guided Snap by dictating the placement of the ads. Doc. 51 at 6; Doc. 23 at 13–14. But Snap's own exhibits show that any advertiser can control this placement. *See* Doc. 53-3. In other words, placing advertisements is a customary option for an advertiser on Snapchat. It doesn't demonstrate that Snap had a "special relationship" with the federal agencies. *Watson*, 551 U.S. at 157. And selecting among a few pre-curated options for placement, as the federal agencies did here, is a far cry from furnishing "detailed government specifications aimed at satisfying pressing federal needs." *Suncor Energy*, 25 F.4th at 1253.[3]

---

[3] Snap's Notice of Removal asserts that the "FDA, through its media agents, sends detailed campaign briefs to Snap that outline the agency's campaign goals and objectives." Doc. 1 at 8 (Notice of

In short, the advertising relationships between Snap and the federal agencies bear many of the hallmarks of an ordinary commercial relationship. Neither DHS nor the FDA exercised exacting oversight or delegated legal authority to Snap. So, Snap didn't act under these federal agencies just because it aired their advertisements.

**B. Lens Production**

Next, Snap highlights that it facilitated production of "lenses" for the federal agencies' campaigns. *E.g.*, Doc. 51 at 3–4. Once more, the federal agencies didn't exercise sufficiently strict guidance or control for this activity to satisfy the acting-under prong. As Snap acknowledges, it didn't produce the lenses, for the most part. Instead, it "connected" the federal agencies with third-party firms who created the lenses. Doc. 1 at 5 (Notice of Removal ¶ 18); Doc. 27 at 4 (Beauchere Decl. ¶ 10); Doc. 28 at 3–4 (Goldberg Decl. ¶ 12). So, the federal agencies directed their guidance, if any, to these third-party lens creators—not Snap. Snap responds, arguing that it played an "active role" in the lens development. Doc. 51 at 4. To be sure, Snap's evidence suggests that it interacted with the FDA's marketing agent, opining which lens "options would be most engaging." Doc. 45-10 at 18–22. What's missing, though, is any detailed command from the federal agencies (or their marketing agents) to Snap.[4] And regardless, the record shows that the federal agencies trusted the third-party lens developers and their "creative freedom." Doc. 45-14 at 5, 6. This faith in the lens vendor's vision,

---

Removal ¶ 27). These briefs set out high-level goals for the FDA's campaigns. *See* Doc. 25-1; Doc. 25-2; Doc. 25-3. They don't provide "strict guidance" for realizing those goals. *Suncor Energy*, 25 F.4th at 1253.

[4] Snap highlights an internal email where a Snap employee commented that the FDA's agent had emailed a "pretty detailed" slide deck. Doc. 45-14 at 5. This stray remark doesn't move the needle. The surrounding context of this email makes it clear that the slide deck contained guidance for the "lens vendor"—not Snap. *Id.* at 5, 7. Regardless, a Snap employee's characterization of instruction as "detailed" doesn't mean much, especially when Snap hasn't directed the court to the substance of the slide deck itself to determine whether it qualifies as "detailed.".

unaccompanied by "a high level of detail and specification in the government's demands[,]" is insufficient to satisfy the acting-under requirement. *Czerno v. Gen. Elec. Co.*, 182 F.4th 15, 23 (1st Cir. 2026).

Snap argues that it performed under "the government's specific guidance" because DHS and the FDA approved various steps in the lens-production process. Doc. 51 at 3–4. But this sort of approval is typical of a mine-run commercial relationship. A buyer pays a servicer for a service; the servicer ensures that it furnishes the service to the buyer's liking. Mere process approval, without more, doesn't demonstrate that the federal actors exercised "strict guidance and control" over Snap. *Suncor Energy*, 25 F.4th at 1253. In other words, the government's periodic approvals and meetings with Snap don't amount to "close supervision over the private entity." *Id.* (quotation cleaned up); *see also Montoya v. Bd. of Cnty. Comm'rs*, 2026 WL 811569, at *10 (D.N.M. Mar. 24, 2026) (holding that government's "discretionary and generally-framed auditing authority" under contract was insufficient to satisfy private actor's acting-under status). So, Snap's involvement in producing lenses for the agencies doesn't qualify it as "acting under" them.

**C. Research**

The closest Snap comes to satisfying the acting-under prong is its argument that it performed research for DHS. Under its MOUs with DHS, Snap agreed to "[r]efin[e], conduct[], and mak[e] available one final tranche of research about teens' and young adults' awareness of, and familiarity with, a variety of sexual-related online risks[.]" Doc. 24-2 at 3; *see also* Doc. 24-1 at 3 (similar). That statement is essentially all the detail the MOUs contain about Snap's agreement to produce this research. Where, as here, a contract defines "the defendant's duties in general terms and the contractor was the one who decided how to fulfill those duties[,]" the "arrangement does not rise to the level of 'acting under.'" *Sunoco*, 39 F.4th at 1110 (quotation

cleaned up); *see also Montoya*, 2026 WL 811569, at *11 (holding that "agreements to assist in the performance of a governmental task" without "strict governmental oversight and supervision" are insufficient to come "within the purview of § 1442(a)(1)").

The MOUs here fall well short of offering the detailed guidance necessary to satisfy the acting-under prong. Consider, for contrast, *Bennett v. MIS Corp.*. There, the Sixth Circuit upheld federal-officer removal after the FAA had hired defendant to perform mold remediation. 607 F.3d 1076 (6th Cir. 2010). The contracts there "included precise specifications." *Id.* at 1087. Among other details, the contracts required defendant to "establish a work area perimeter," use "6-mil plastic sheeting," equip scrubber machines with high-efficiency particulate air filters, and dispose of mold according to contractually specified procedures. *Id.* The contracts also set out protocols for federal officers to supervise defendant's work. *Id.* This set of circumstances, the Sixth Circuit explained, involved an "unusually close" relationship "involving detailed regulation, monitoring, and supervision." *Id.* at 1088 (quotation cleaned up). It thus satisfied the acting-under prong for federal-officer removal. *Id.*

The legal instruments connecting Snap to DHS and the FDA look nothing like the contracts in *Bennett*. The Snap contract's one-sentence reference to research contains nearly zero detail. It doesn't dictate how Snap should conduct research, what "sexual-related online risks" it should consider, or when or in what format it should return the research. What's more, the MOUs expressly disclaimed creating "any legal obligation on the part of either party." Doc. 24-1 at 5; Doc. 24-2 at 6. Instead, the MOUs declare that they are "strictly for internal management purposes for each of the Parties." Doc. 24-1 at 5; Doc. 24-2 at 6. Such overt disclaimers of legal effect are strong indicators that DHS didn't delegate any authority to Snap.

As the Supreme Court has explained, federal agencies don't "normally delegate legal authority to private entities without saying that they are doing so." *Watson*, 551 U.S. at 157.

Snap cites an email exchange where DHS gave some line-item edits to proposed research questions. *See* Doc. 45-6 at 4; Doc. 45-7. But the context of these emails suggest that it was Snap, not DHS, running the show. The parties' communications show that Snap was deciding when it would send the questions and to whom it would send them. Doc. 45-6 at 4. And Snap came up with the initial questions. *Id.* What's more, DHS's edits to the questions weren't nearly as "detailed" as Snap's argument contends. Doc. 51 at 5. Instead, they largely consisted of modest wording changes such as swapping out "more" for "additional" or "did you like" for "caught your attention." Doc. 45-7 at 2. Even the more involved comments are akin to those made by a run-of-the-mill editor, not a regulator. *Id.* at 3 (suggesting that the author might get the same answer from another question or that the author should "[b]e more specific"). This mundane back and forth reveals anything but "strict guidance and control." *Suncor Energy*, 25 F.4th at 1253.

No doubt, Snap performed some services for federal officers. Some of those services—like advertising on Snapchat—reflect no more than a standard arms-length commercial transaction. Other services, like lens production and custom research, didn't involve a federal officer's "strict guidance or control" over Snap. *Id.* at 1253. Snap thus has failed to identify any conduct that qualifies it as acting under a federal officer. In turn, Snap has failed to justify this federal court's exercise of jurisdiction. So, the court grants Kansas's Motion to Remand (Doc. 11).[5]

---

[5] The court recognizes that the Northern District of Florida reached a different result on an essentially identical motion. *See Off. of Att'y Gen. v. Snap Inc.*, 2025 WL 4035005 (N.D. Fla. Aug. 13, 2025), *appeal docketed*, No. 25-12814 (11th Cir. Aug. 18, 2025). The court respectfully disagrees with that case's analysis, which suggests that Snap needn't show a close or extensive relationship with the

## IV. Next Steps

Because the court grants Kansas's motion to remand, the court must look ahead with a practical eye to the next steps in this case. Rule 62 provides that "execution on a judgment and proceedings to enforce it are stayed for 30 days after its entry, unless the court orders otherwise." Fed. R. Civ. P. 62(a). This Order qualifies as a "judgment" as the Federal Rules define that term because it's an appealable order. *See* Fed. R. Civ. P. 54(a) (defining "judgment" to "include[] a decree and any order from which an appeal lies"); 28 U.S.C. § 1447(d) (authorizing review of remand order if the case "was removed pursuant to section 1442"). Rule 62 thus mandates an automatic 30-day stay on this Order. *See Kansas v. Pfizer, Inc.*, 2025 WL 1548507, at *2–3 (D. Kan. May 30, 2025). Consistent with Rule 62, the court directs the Clerk of Court to withhold mailing this Order to the Washington County, Kansas Court until further order.[6]

## V. Conclusion

Snap has failed to carry its burden to show that the court has jurisdiction over this action. The court thus grants Kansas's Motion to Remand (Doc. 11) but stays execution of this remand until further Order.

---

federal government to satisfy the acting-under prong. *Id.* at *3–4. That conclusion isn't tenable under Tenth Circuit law, which requires "strict guidance or control" and "close supervision of the private entity by the government[.]" *Suncor Energy*, 25 F.4th at 1253 (quotation cleaned up).

[6] Anticipating that Snap may file a motion to stay execution of this Order pending appeal, this footnote adopts an expedited briefing schedule to govern such a potential motion. If Snap wishes to file a motion to stay execution of this Order pending appeal, it is due within 14 days of this Order. If Kansas opposes such a motion, its response is due 10 days after Snap files its opening brief. Any reply is due 7 days after Kansas files its response. The parties' principal briefs may not exceed 10 pages. Any reply may not exceed 5 pages. The parties' briefs should address the burgeoning Circuit split about whether an appeal automatically stays execution of a remand order. *Compare City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265 (4th Cir. 2025), *and City of Brunswick*, 2026 WL 2224648, at *3–7, *with California ex rel. Harrison v. Express Scripts, Inc.*, 139 F.4th 763 (9th Cir. 2025); *see also Utah v. Express Scripts*, No. 26-4035 (10th Cir. Apr. 2, 2026) (pending Tenth Circuit appeal on this issue).

As a final matter, the court grants Snap's pending motions to seal and redact. Doc. 29; Doc. 50; Doc. 58. For those documents for which Snap has requested redactions, Snap should file those documents—in the public record, with redactions—within seven days of this Order.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff State of Kansas's Motion to Remand (Doc. 11) is granted. The court temporarily stays the execution of this remand until further Order. For now, the court directs the Clerk of Court to refrain from mailing a copy of this Order to the Washington County, Kansas Court.

**IT IS FURTHER ORDERED THAT** defendant Snap Inc.'s Motion to Seal or Redact (Doc. 29) is granted. The court directs the Clerk to seal Doc. 23; Doc. 24-1; Doc. 24-2; Doc. 25-1; Doc. 25-2; and Doc. 25-3 permanently. The court directs the Clerk to unseal Doc. 24 and Doc. 25. And the court directs Snap to file redacted versions of Doc. 23, Doc. 24-1, and Doc. 24-2 on this case's docket within seven days of this Order.

**IT IS FURTHER ORDERED THAT** defendant Snap Inc.'s Motion to Redact (Doc. 50) is granted. The court directs the Clerk to seal Doc. 45; Doc. 45-1; Doc. 45-2; Doc. 45-3; Doc. 45-4; Doc. 45-5; Doc. 45-6; Doc. 45-7; Doc. 45-8; Doc. 45-9; Doc. 45-10; Doc. 45-11; Doc. 45-12; Doc. 45-13; Doc. 45-14; Doc. 45-15; Doc. 45-15; Doc. 45-16; Doc. 45-17; and Doc. 45-18 permanently. And the court directs Snap to file redacted versions of Doc. 45; Doc. 45-1; Doc. 45-2; Doc. 45-3; Doc. 45-4; Doc. 45-5; Doc. 45-6; Doc. 45-8; Doc. 45-9; Doc. 45-10; Doc. 45-11; Doc. 45-12; Doc. 45-13; Doc. 45-14; Doc. 45-15; Doc. 45-16; Doc. 45-17; and Doc. 45-18 on this case's docket within seven days of this Order.

**IT IS FURTHER ORDERED THAT** defendant Snap Inc.'s Motion to Redact and Seal (Doc. 58) is granted. The court directs the Clerk to seal Doc. 51; Doc. 54; Doc. 54-1; Doc. 54-2; Doc. 54-3; Doc. 54-4; Doc. 54-5; Doc. 54-6; Doc. 54-7; and Doc. 54-8 permanently. And the

court directs Snap to file the redacted versions of Doc. 51; Doc. 54; Doc. 54-1; Doc. 54-2; Doc. 54-5; Doc. 54-6; Doc. 54-7; and Doc. 54-8 on this case's docket within seven days of this Order.

**IT IS FURTHER ORDERED THAT** the Clerk of Court update the docket to list defendant as "Snap Inc."—not "Snap, Inc."

**IT IS SO ORDERED.**

**Dated this 26th day of August, 2026, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**