**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| STATE OF KANSAS, *ex rel.* KRIS W. KOBACH, Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>SNAP INC.,<br><br>Defendant. | Case No. 5:25-cv-04109-DDC-GEB |

**DEFENDANT SNAP INC.'S OPPOSITION TO THE STATE'S MOTION TO REMAND**

Snapchat, operated by Defendant Snap Inc. ("Snap"), is a popular communication tool that has a far-ranging and impactful reach, with millions of users nationwide including many teens. Platforms like Snapchat are "integral to the fabric of our modern society and culture" and operate as "the modern public square" for users to explore and exchange ideas. *Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017). It is therefore unsurprising that federal agencies including the Department of Homeland Security ("DHS") and the U.S. Food and Drug Administration ("FDA") enlist Snap to carry out their respective missions of educating American teens with vital public safety and health information. These missions use popular and entertaining Snap features to deliver information through campaigns like Know2Protect, Pledge2Protect, and the Blue Campaign that educate about child sexual exploitation and abuse ("CSEA") and human trafficking, as well as the dangers of vaping and tobacco use. Snap works with and under the guidance of both agencies in fulfilling their statutory duties to create and disseminate this content to teens aged 13 to 17 through Snapchat elements that facilitate engagement.

The Office of the Attorney General for the State of Kansas (the "State") alleges that Snap violated the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.* (the "KCPA"), claiming that certain Snapchat features, including those Snap uses in its work for DHS and the FDA, lead to addiction in minors. In effect, the State seeks to hold Snap liable for certain features that Snap uses to implement the federal agencies' campaigns and ensure the messaging reaches their targeted teenage audience in a manner consistent with the agencies' goals and guidance.

Similarly, the State's KCPA allegations about Snap's mobile store age ratings and the amount of "mature content" available on Snapchat jeopardizes the efficacy of federal agencies' educational initiatives. This construction of the KCPA would impair Snap from broadcasting federal public service announcements about sexual exploitation of children, human trafficking,

vaping, and tobacco, which would fall within the State's broad definition of "mature content."

Because the State's claims relate to and would impair the work that Snap conducts together with and under the guidance of federal agencies, Snap removed this case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). In seeking to remand, the State promotes the misconception that removal of this case is in conflict with its ability to enforce its laws (and ignores the federal functions it jeopardizes). Removal impacts only where the State can enforce its laws, not whether it can. Given the federal interests at risk, Snap is entitled to have those claims decided in a federal forum. The State's arguments subvert controlling precedent by promoting an improperly heightened standard and invoking out-of-circuit and outdated authority. Snap therefore respectfully requests that the Court deny the State's Motion to Remand (the "Motion") and direct this action to proceed in federal court.[1]

## BACKGROUND

### I. Snap Assists Federal Government Agencies in Fulfilling Their Statutory Duties

U.S. Department of Homeland Security: Snap works with DHS as a "foundational collaborator" on its Know2Protect campaign dedicated to raising awareness about the risks of CSEA, as well as the campaign's official call-to-action—Pledge2Protect. Beauchere Decl. ¶¶ 4, 6. Snap's work on these important campaigns is guided by Memoranda of Understanding ("MOUs") entered into by DHS and Snap, which task Snap with assisting DHS in three primary ways. *Id.* ¶¶ 5–6. *First*, Snap conducts bespoke research to help DHS understand young people's awareness of and experience with CSEA and design effective campaigns to combat it. *Id.* ¶ 7. *Second*, Snap collaborates with DHS to build and deploy custom Know2Protect and Pledge2Protect content for Snapchat, including custom Lenses—Snapchat-specific features that add interactive effects to

[1] In filing this Opposition, Snap does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

users' videos—designed to engage teens. *Id.* ¶¶ 8–13. The Know2Protect Lens was designed to "engage teens through a fun and interactive quiz" about online safety that is meant to be "an entertaining adventure."[2] The Pledge2Protect Lens was part of a successful Snapchat-specific effort that resulted in tens of thousands of teens taking a pledge to protect themselves and others. *Id.* ¶¶ 9, 20. *Third*, Snap offers DHS advertising grants that the agency uses to promote its campaigns on Snapchat and largely uses to target teens aged 13 to 17. *Id.* ¶¶ 14–15. By way of example, one Know2Protect advertising campaign received more than **15 million** impressions on Snapchat, with more than 95% coming from targeted users aged 13 to 17. *Id.* ¶ 15.

DHS also turns to Snap for assistance in promoting its Blue Campaign, an awareness campaign aimed at educating the public about human trafficking. *Id.* ¶ 21. In doing so, DHS has chosen to target some Blue Campaign advertisements to users aged 13 to 17. *Id.* ¶ 22. These advertisements have also been very successful in reaching teen audiences, with one recent advertising campaign receiving more than **6 million** impressions, and more than 99% of those views coming from targeted users aged 13 to 17. *Id.*

DHS chooses the placement of its advertisements among Snapchat's surfaces and features, and has selected to run advertisements for Know2Protect, Pledge2Protect, and the Blue Campaign in Snapchat's "Stories," "Spotlight" feature, and "Discover" feed. *Id.* ¶¶ 17, 24. Stories is a component of Snapchat where users share photos or videos that typically disappear after 24 hours by default. Spotlight is a short-form video feed within Snapchat that showcases personalized and entertaining user-generated content. Discover is a dedicated section on Snapchat featuring curated content based on the user's interests, including vetted content from trusted partners. The State's Petition alleges that all three components of Snapchat are unconscionable under the KCPA.

---

[2] DHS, *DHS Know2Protect and Snap Inc. Launch Innovative Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024), available at https://perma.cc/6LEW-277X.

U.S. Food and Drug Administration: Snap has worked with the FDA for years to promote "The Real Cost" and "Next Legends," two FDA public health initiatives that seek to reach teens with messages about the risks of nicotine, cigarettes, and vaping. Goldberg Decl. ¶ 3. Snap's assistance to the FDA is illustrated by its three approved campaigns for 2025. *First*, Snap received briefs outlining the FDA's objectives and contractor specifications for the advertising campaigns, including the targeting of teenagers aged 13 to 17. *Id.* ¶ 17. *Second*, Snap prepared and submitted custom proposals outlining how it could assist the FDA in meeting the campaigns' goals. *Id.* ¶ 18. *Third*, the FDA approved the campaigns and proceeded to purchase Next Legends advertising for January 2025. *Id.* ¶¶ 19–20. The FDA's contractor agency typically places advertising orders on the FDA's behalf, binding the FDA to Snap's Business Services Terms. *Id.* ¶ 20.

Like DHS, the FDA selects target audiences and advertisement placements. Through its agency, the FDA has chosen to target several The Real Cost and Next Legends advertisements to Snapchat users aged 13 to 17, *id.* ¶ 4, and selected to run certain ads targeting users aged 13 to 17 in Snapchat's Stories, Spotlight, and Discover features, *id.* ¶ 7, which are components of Snapchat the State alleges are unconscionable. These FDA efforts to reach teenagers through Snapchat are remarkably successful. In 2024 alone, The Real Cost campaign advertisements resulted in approximately **1.6 billion** impressions on Snapchat from targeted users aged 13 to 17. *Id.* ¶ 5.

During active advertising campaigns, a dedicated client partner from Snap holds bi-weekly meetings with the FDA's contractor agency to review the campaign's performance, receive guidance, and offer advice on reaching the FDA's campaign goals. *Id.* ¶ 15. Snap has also helped the FDA create custom Lenses for The Real Cost and Next Legends. *Id.* ¶ 10. In 2024, for example, Snap worked to develop an interactive Lens that educates users about the dangers of vaping. *Id.* ¶¶ 11–12. This process took more than six months, involved extensive feedback and guidance from

the FDA, and required Snap and its Lens creative partner to regularly communicate with the FDA's agency and create multiple iterations of creative content for the FDA's consideration. *Id.*

## II. Procedural History

On September 23, 2025, the State filed a Petition against Snap in Kansas state court, alleging four counts under the KCPA. Counts I and II allege that representations Snap made related to Snapchat's age ratings in mobile application stores and the prevalence of "mature" content (including profanity, sexual content, and drug content) on the platform amounted to deceptive practices and unconscionable acts. *E.g.*, Pet. ¶¶ 2, 45. Counts III and Count IV allege that certain of the platform's features—including Snap's algorithms for recommending content, Pet. ¶ 124, and its Stories, Spotlight, and Discover features, Pet. ¶¶ 25, 31–32—"promote compulsive, prolonged, and unhealthy use by children." Pet. ¶ 161. As described above, DHS and the FDA seek Snap's assistance to use these features to ensure their ad content reaches their desired teenage audiences. Among other remedies, the State seeks an injunction prohibiting further (alleged) KCPA violations, Pet. at 38–39, which would interfere with Snap's ability to fulfill its partnerships with DHS and the FDA.

Snap timely removed this action to this Court, invoking the Court's jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Dkt. No. 1. On December 2, 2025, the State filed a Motion to Remand (the "Motion"). Dkt. No. 11.

## LEGAL STANDARD

A defendant may remove a civil state action to federal court if the case is "against or directed to" "any person acting under [an] officer[] of the United States or of any agency thereof . . . relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The removing defendant must meet three requirements of "federal officer" removal. *First*, the defendant must show that it

"acted under the direction of a federal officer." *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022). *Second*, the claims the defendant seeks to remove must have "a connection or association with government-directed conduct." *Id. Third*, the defendant must have "a colorable federal defense to the claim or claims." *Id.* "Unlike other removal statutes," the federal officer removal statute "should 'be liberally construed to give full effect" to its "basic purpose" of "protect[ing] against the interference with federal operations." *Id.* at 1250–51 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *see Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (rejecting "a narrow, grudging interpretation").

A private entity acts under a federal agency when it acts "to *assist*, or to help *carry out*, the duties or tasks of the federal superior" in a manner that goes beyond "simply *complying* with the law." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007) (emphasis in original). This dynamic "typically involves subjection, guidance, or control." *Id.* at 151 (internal quotations and citation omitted). As the Tenth Circuit has explained, "this closely supervised work must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Suncor*, 25 F.4th at 1253. This is a "broad" and "liberally construed" requirement. *Watson*, 551 U.S. at 147.

The "connection or association" requirement presents a "hurdle" that is "quite low." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017) (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)); *see also Goncalves ex rel. Goncalves v. Rady Childs. Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017). This is because Congress broadened the statute in 2011 to cover actions "*relating to* an act under color of federal office," and courts broadly interpret the phrase "relating to." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir.

2020) (en banc) (emphasis in original); *see also, e.g.*, *Caver*, 845 F.3d at 1144 n.8 (by adding the phrase "or relating to" Congress "intended to broaden the scope of acts" that qualify for federal officer removal); *DeFiore v. SOC LLC*, 85 F.4th 546, 557 n.6 (9th Cir. 2023); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 n.4 (1st Cir. 2022) (same); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *In re Commonwealth's Mot. to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 471 (3d Cir. 2015) (same).[3]

## ARGUMENT

Snap's work assisting DHS and the FDA satisfies all three requirements of the federal officer removal statute. The State does not contest that Snap has raised multiple federal defenses that clearly meet the "colorable" threshold. *See* Mot. at 3. And as described below, Snap also meets both the broad "acting under" and "connection or association" requirements.

### I. Snap Meets the "Acting Under" Requirement

DHS and the FDA Guide Snap's Assistance with the Agencies' Statutory Duties: Both DHS and the FDA have statutory responsibilities to educate Americans, including young teenagers, on harms the agencies are charged with combatting. *First*, DHS is responsible under 6 U.S.C. § 473(b)(2)(F) for "outreach and training activities" concerning child exploitation in "collaborat[ion] with other governmental, nongovernmental, and nonprofit entities" and is carrying out these duties when it works with Snap to promote the Know2Protect and

[3] The Supreme Court will hear argument concerning "[w]hether a causal-nexus or contractual direction test survives the 2011 amendment to the federal-officer removal statute" on January 12, 2026. Pet. for Writ of Cert., *Chevron USA Inc. v. Plaquemines Par.*, 145 S. Ct. 2792 (No. 24-813). Because Snap's implementation of the federal agencies' requests gives rise to the State's claims, removal is appropriate regardless of how that question is resolved. Nevertheless, because the Supreme Court's forthcoming analysis may provide this Court with important guidance on applying the federal officer removal statute, it may be appropriate to reserve decision on the State's Motion until after the Supreme Court issues its decision in *Plaquemines*, with the parties to submit supplemental briefs addressing the impact (if any) of the decision within 30 days after it is decided.

Pledge2Protect initiatives. *Second*, DHS is required under 6 U.S.C. § 242a(c) to "operate the Blue Campaign's nationwide public awareness effort and any other awareness efforts needed to . . . prevent human trafficking" and "coordinate external engagement . . . regarding human trafficking with critical partners, including . . . corporations." *Finally*, the FDA is required to "conduct[] educational and public information programs relating to [its] responsibilities," 21 U.S.C. § 393(d)(2)(D), which include implementing the 2009 Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), 21 U.S.C. § 387a(e). A key objective of FSPTCA is "reducing the use of tobacco by minors" to reduce premature deaths, FSPTCA, Pub. L. No. 111-31, § 2(14), 123 Stat. 1776, 1777 (2009), which is also the key objective of The Real Cost and Next Legends.

Snap acts under DHS and the FDA to help carry out these statutorily mandated duties. In particular, Snap assists in designing their advertising campaigns, and does so (a) in compliance with detailed guidance provided to Snap, including in the form of MOUs and campaign briefs; (b) through regular meetings and feedback cycles; and (c) subject to the agencies' ultimate control and approval of their advertisements' content and design. Snap implements the agencies' advertisements in accordance with their specifications concerning the placements and target audiences for the advertisements. Snap also assists by producing essential government products, including custom research for DHS and custom Lenses for both agencies' initiatives.

This work is critical for accomplishing key government tasks. *See Suncor*, 25 F.4th at 1253. In the words of DHS's Know2Protect campaign manager, "[t]he collaboration between Snap and Know2Protect is instrumental in helping [DHS] reach key demographics with critical awareness and prevention messaging," and makes "a real difference in saving lives." Beauchere Decl. ¶ 19. According to the campaign manager, "Snap's continued support allows [DHS] to reach and empower a critical audience that [DHS] couldn't effectively reach on [its] own." *Id.* Thus, the

State's attempts to minimize these efforts by stating that Snap "simply" provided DHS with advertising credit, *see* Mot. at 9, are plainly refuted by the record.

Snap's bespoke work goes well beyond a "mere contract" for goods and services, *see* Mot. at 8, and easily satisfies the liberal "acting under" requirement. The Northern District of Florida recently confirmed this, holding that Snap's work with these agencies met the statutory threshold in a case brought by the Florida Attorney General. Mot. Ex. E at 12. As that court correctly observed, Snap's targeted advertising campaigns are "distinct from the simple sale of commercial goods because they require tailoring the execution of the service to the government's directions." *Id.* at 7–8 & n.8. This is far from the "limitless construction" the State portrays. *See* Mot. at 9.[4]

<u>The Scope and Exercise of Governmental Authority</u>: The State concedes that DHS and the FDA are fulfilling statutory duties by targeting key young audiences through Snap. *See* Mot. at 7. It argues, however, that Snap did not carry out those statutory duties in the agencies' "stead," specifically pointing to language in the MOUs between DHS and Snap clarifying that those agreements do not "limit or affect in any way the authority or legal responsibilities of DHS." *Id.*[5] But the State has pointed to no authority suggesting that in order to "help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government

---

[4] The State is plainly wrong to suggest "Snap's role in assisting these public information campaigns . . . involved doing something the government *could only accomplish through the private sector*." Mot. at 8 (internal quotations and citation omitted). The government often conducts public outreach through the public sector and with publicly funded institutions (*e.g.*, schools or community centers). *See, e.g.*, DHS, *Know2Protect Training* (last updated Dec. 17, 2025), *available at* https://perma.cc/8K6H-WFEV (DHS agents offer presentations "with targeted content for audiences in schools and to parent and community groups").

[5] The State quotes Snap's Business Services Terms governing Snap's relationship with the FDA, Mot. at 7 ("Snap will not be a sponsor or administrator of [the FDA's] Promotion." (alteration in original)), but the quoted language is inapplicable. "Promotion" is defined within the Terms to mean the use of "a Snapcode, ad or any other content, data, or information relating to your use of the Business Services as part of a sweepstakes, contest, offer, or other promotion." Goldberg Ex. H § 2(d). The State has not identified any FDA advertisement qualifying as such a "Promotion." *Cf. id.* § 10 (differentiating between "Promotions Rules" and "Advertising Policies").

products," *Suncor*, 25 F.4th at 1253, a private entity must take full responsibility for those needs, tasks, or products. Indeed, the State's construction would limit federal officer removal to situations where a federal officer or agency has abdicated its statutory obligations to a private entity. But the case law is clear that a private entity need only assist or help carry out the federal duties under the government's "subjection, guidance, or control." *Id.* at 1251.

Relatedly, the fact that the FDA's contractor places the FDA's orders does not undermine the fact that Snap is acting under the FDA's federal authority. *See Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021) (such an interpretation would "significantly curtail[]" federal officer removal "as federal contracts are often carried out, at least in part, through subcontractors"); Mot. Ex. E at 8 n.8. Snap receives detailed campaign briefs outlining the objectives, target audiences, subject matter, and success metrics for the FDA's campaigns, as well as consistent guidance on the FDA's goals at bi-weekly meetings. Goldberg Decl. ¶¶ 15, 17. The FDA has also exercised control over the production of custom Snapchat Lenses for FDA campaigns, an iterative process that can take several months to develop and code and involves extensive feedback and requests from the FDA. *Id.* ¶¶ 12, 14. The contractor agency's coordination of these efforts does not diminish Snap's ultimate accountability to the FDA.

<u>Common-Law Agency Not Required</u>: The State improperly focuses on the lack of principal-agent relationships between the federal agencies and Snap, attempting to inject additional restrictions into the broad "acting under" requirement. *Watson*, 551 U.S. at 147. The State is wrong to suggest that a private entity must demonstrate the control animating a principal-agent relationship to meet the "acting under" requirement. As the State itself recognizes, the Supreme Court requires "subjection, guidance, or control." Mot. at 3–4 (quoting *Watson*, 551 U.S. at 151–52). Because "control is an essential element of the [agency] relationship," *Alfaro-Huitron v.*

*Cervantes Agribusiness*, 982 F.3d 1242, 1252 (10th Cir. 2020), the Supreme Court's inclusion of the less stringent term "guidance" demonstrates how a common-law agency relationship is not required. The State cites no case adopting an agency requirement for federal officer removal, and even the out-of-circuit case the State cites for its specious argument explicitly reserved the question of "whether 'acting under' a federal officer is a status necessarily limited to the government's common-law agents." *DeFiore v. SOC LLC*, 85 F.4th 546, 556 (9th Cir. 2023).

Federal Officer *or Agency* Removal: Finally, Snap can satisfy the "acting under" requirement through work conducted under either a federal officer *or* federal agency. The State relies on an out-of-circuit dissent to argue that Snap cannot satisfy the requirement because it has not identified specific federal officers at DHS or the FDA whom it is assisting. Mot. at 9 (citing *DeFiore*, 85 F.4th at 562 (Collins, J., dissenting)). This notion is contrary to established law and practice and should be rejected. *See, e.g.*, *Watson*, 551 U.S. at 151 ("The relevant relationship is that of a private person '*acting under*' a federal 'officer' or 'agency.'" (citation omitted)); *Suncor*, 25 F.4th at 1253–54 (analyzing Exxon's contractual relationship with the Department of Interior to determine if Exxon satisfied the "acting under" requirement); Mot. Ex. E at 7 ("Snap's relationships with DHS and FDA clear [the 'acting under'] bar.").

## II. Snap Meets the Connection-or-Association Requirement

The Challenged Snapchat Features Directly Relate to the State's Claims: The Petition seeks to hold Snap liable for conduct "relating to" its implementation of advertisement campaigns for federal agencies. As described in Count IV of the Petition (and also applicable to Count III), Snap's supposed KCPA violations are based partly on "Snap's choice to design Snapchat to include features known to promote compulsive, prolonged, and unhealthy use by children." Pet. ¶ 161; *see also* Pet. ¶¶ 154–55 (seeking to hold Snap liable for deceptive acts concerning Snapchat, which

the State alleges "is inherently addictive and psychologically harmful to children"). However, the federal government's advertising campaigns leverage these very Snapchat-specific features that give rise to the State's theory of liability. *See* Pet. ¶¶ 25, 31–32.

*First*, the State challenges the algorithms Snap uses to recommend and deliver content, Pet. ¶ 124, which Snap relies on to reach the federal agencies' intended audiences, Beauchere Decl. ¶¶ 16, 23; Goldberg Decl. ¶ 5. The State alleges these algorithms operate with disregard for users' mental well-being and "promote behavioral addiction among young users." Pet. ¶ 124.

*Second*, DHS and the FDA have chosen to place advertisements via the challenged features, including "Stories," *see supra* pp. 3–4, which typically automatically expire after 24 hours. The State alleges such ephemerality is a "hallmark feature" of Snapchat that "drives addiction," Pet. ¶ 3, "encourages young people to exchange sexual content," Pet. ¶ 60, and empowers minors to exchange content involving alcohol and drug use, Pet. ¶ 93. The State further alleges that Stories are presented with "infinite scrolling," which "drives behavioral addiction and promotes mental health harms to children." Pet. ¶¶ 106–07.

*Finally*, the agencies have placed advertisements in the "Spotlight" and "Discover" features, which the State argues present content via continuous scrolling and incorporate an "auto-play" feature that contributes to addiction in minors. Pet. ¶¶ 31–32, 114. Count IV of the Petition is explicitly based on "Snap's intentional design features, such as infinite scroll, . . . and auto-play video," which the State alleges "are purposely designed to maximize user engagement and exploit the developing brains of children, leading to behavioral addiction, disrupted sleep, and displacement of healthy activities." Pet. ¶ 160.

<u>Use of the Challenged Features Is Necessary</u>: While Snap need only demonstrate a relationship between its work for the federal government and the State's claims to remove, this

case involves more: the challenged Snapchat features and functionalities are key for meeting the federal agencies' goals. *See Sawyer*, 860 F.3d at 258 (rejecting a "showing of a specific government direction" standard). The State's theory of liability is based in part on features that "encourage more engagement on Snapchat and contribute[] to compulsive use," Pet. ¶ 120, including gamified features, Pet. ¶ 117. The record demonstrates that the FDA uses Snap precisely [redacted] *see, e.g.*, Goldberg Ex. F, and, to achieve this goal, its agency specifically requested advertising [redacted] *Id.* Likewise, DHS turns to Snap because of its ability "to help spread awareness to one of the [Know2Protect] campaign's key audiences: teens" and to engage teens "directly" on a platform that "resonates strongly with teens." DHS, *supra* n.2. In setting up advertisements targeted at teens aged 13 to 17, the agencies have either opted to run their content across all of Snapchat—including in Stories, Spotlight, and Discover as available—or customized the placement of their advertisements, in some instances specifically selecting placements in Stories, Spotlight, and/or Discover. Beauchere Decl. ¶¶ 17, 24; Goldberg Decl. ¶ 7.

This case is distinguishable from *Kansas v. Pfizer, Inc.*, 2025 WL 1394240 (D. Kan. May 14, 2025), which involved KCPA claims based on Pfizer's marketing of a vaccine it contracted with the FDA to produce. *Id.* at *1. Unlike Snap, Pfizer had "'complete latitude' to market its vaccine and communicate with the public in any fashion it chose." *Id.* at *5 (quoting *Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 341 (5th Cir. 2024)). Pfizer also "engaged in the challenged conduct of its own initiative in fulfillment of a tangentially related federal directive." *Id.* at *6 (quoting *Plaquemines*, 103 F.4th at 343). By contrast, the conduct the State challenges

here is itself crucial to Snap's work with DHS and the FDA. Whereas Pfizer's fulfillment of its obligation to produce a vaccine was unrelated to its marketing efforts, Snap's success in assisting federal agencies with their duties is directly related to how their content is delivered to teens on Snapchat. The agencies' advertising efforts are successful because teens engage with the agencies' selected Snapchat features, and it is impossible to separate that fact from the State's allegations.

<u>The Florida Ruling Was Proper</u>: The Florida court's holding that Snap's work with DHS and the FDA was sufficiently related to the claims asserted against Snap—because the attorney general sought to impose liability on Snap for distributing the federal government's messages in the manner the government requested—is instructive here. Mot. Ex. E at 10–12. The State mischaracterizes the court's analysis as concerning "whether liability might have *any remote effect on* the federal government's advertising efforts," Mot. at 12–13 (emphasis in original), but the court used no such language and in fact applied the same standard recognized by this Court and the majority of circuits considering the issue, *see Pfizer*, 2025 WL 1394240 at n.4, *supra* pp. 6–7.

<u>The State's Mature Content Claims</u>: The allegations supporting Counts I and II of the Petition concerning age ratings also threaten to impair Snap's ability to fulfill its duties in assisting DHS and the FDA. Specifically, the State alleges that Snap violates the KCPA in part because it "hosts enormous amounts of interactive mature content." Pet. ¶ 38. As used in the Petition, "mature content" is broad and ill-defined. For example, the Petition defines "mature/suggestive themes" to include "sexual content" among other "complex themes that are suitable only for adult audiences," with a catchall category of "other dangerous behavior." Pet. ¶ 67. Content about CSEA and human trafficking, including the interactive Lenses that direct teens to Know2Protect and Pledge2Protect content, could easily fall within this category and therefore (under the State's theory) violate the KCPA. The State's theories are also partially based on the purported prevalence of Snapchat

content that *references* tobacco and other drugs. Pet. ¶ 49. The FDA's advertising campaigns, including the interactive The Real Cost and Next Legends Lenses, reference vaping and tobacco use, and would also violate the KCPA under the State's theory.

The State's Remaining Arguments: The State advances the circular argument that its claims cannot be related to Snap's work for DHS and the FDA because the governing contracts include terms that maintain Snap's responsibility to comply with the law. The State reasons that because the agreements do not authorize Snap to violate the law, any KCPA violations "are necessarily unrelated" to Snap's conduct in assisting the agencies. Mot. at 12. This argument improperly presupposes Snap's conduct violated the KCPA (it did not) and encourages the Court to prejudge the merits. Contracts often include provisions requiring the parties to comply with the law, and, if the State's construction were accepted, it would be difficult to imagine what state claims *would* be removable on federal officer grounds. Moreover, such a construction is inconsistent with the broad federal officer removal statute, the purpose of which is to provide federal officers and those acting under the officers the opportunity to have claims against them considered in a federal forum. *See Watson*, 551 U.S. at 150–51; *cf. In re Commonwealth's Mot.*, 790 F.3d at 472.

## CONCLUSION

For the foregoing reasons, removal of this case[6] was appropriate under the federal officer removal statute, and this Court should deny the State's Motion to Remand.[7]

---

[6] This Court has jurisdiction over all four counts of the Petition pursuant to the federal officer removal statute. However, should the Court determine that it only has jurisdiction over some of the claims, as detailed in the Notice of Removal, it would have supplemental jurisdiction over the remaining claims under both the federal officer removal statute and 28 U.S.C. § 1367. The State does not contest that such supplemental jurisdiction would be appropriate.

[7] If the Court grants the Motion, Snap respectfully requests that the Court exercise its discretion to refrain from sending the "certified copy" of its order to the state court pursuant to 28 U.S.C. § 1447(c), until after any appeal of an order granting remand has been resolved (or until after the 30-day time period to file a notice of appeal has expired).

Respectfully Submitted,

DATED: December 23, 2025

By: /s/ *Brian C. Fries*

Brian C. Fries (KS #15889)
Carrie E. Josserand (KS #18893)
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108-2618
Tel: (816) 292-2000
brian.fries@lathropgpm.com
carrie.josserand@lathropgpm.com

Edward D. Greim (KS #21077)
Paul E. Brothers (KS #26863)
Matthew R. Mueller (KS #28499)
Katherine E. Mitra (KS #79151)
GRAVES GARRETT GREIM LLP
1100 Main Street, Suite 2700
Kansas City, MO 64105
Tel: (816) 256-3181
edgreim@gravesgarrett.com
pbrothers@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com

Jeannie S. Rhee (*admitted pro hac vice*)
L. Rush Atkinson (*admitted pro hac vice*)
Kyle Smith (*admitted pro hac vice*)
Elizabeth N. Brandt (*admitted pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, D.C. 20004-2637
Tel: (202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
ksmith@dirllp.com
ebrandt@dirllp.com

Christine M. Ray (*admitted pro hac vice*)
DUNN ISAACSON RHEE LLP
11 Park Place
Tel: (212) 470-1306
New York, NY 10007
cray@dirllp.com

*Attorneys for Defendant Snap Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2025 a copy of the foregoing document was filed with the Clerk of Court via the CM/ECF system and served via the Court's electronic filing system, and by Electronic Mail, on all counsel of record.

/s/ *Brian C. Fries*
Brian C. Fries
*An Attorney for Defendant Snap Inc*.