**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **STATE OF KANSAS, *ex rel.* KRIS W. KOBACH, Attorney General,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO. 5:25-CV-04109-DDC-GEB** |
| **v.** | ) | |
| **SNAP INC.,** | ) | |
| **Defendant.** | ) | |

**ATTORNEY GENERAL'S REPLY IN SUPPORT OF MOTION TO REMAND**

Snap's response to the Attorney General's remand motion confuses collaboration with the "strict guidance or control" necessary to satisfy the acting-under requirement. *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022). Following Snap's response, this Court authorized limited jurisdictional discovery to determine whether Snap's advertising relationships with DHS and the FDA satisfy the requirements of Section 1442(a)(1). That discovery revealed that Snap cannot carry its burden to establish that it acted under a federal officer.[1] Indeed, that discovery is best summarized by what Snap told DHS in 2023 regarding the Blue Campaign: "[W]e are not able to manage the ad campaign on behalf of HSI [Homeland Security Investigations] -- apologies for the inconvenience!" SNAP-KSAG-00000012 (Ex. 1).

Snap must clear the high bar of "strict guidance or control" to establish federal-officer jurisdiction. *Suncor*, 25 F.4th at 1253. Indeed, the bar is so high that the Supreme Court concluded

[1] Because the jurisdictional discovery is most relevant to the acting-under requirement, the Attorney General focuses this reply on that requirement but still maintains that the relatedness requirement is not satisfied for the reasons set forth in his motion to remand. DE11:10–15.

in *Watson v. Philip Morris Cos.* that not even a tobacco company that had "assumed responsibility for cigarette testing, running the tests according to FTC specifications and permitting the FTC to monitor the process closely" could satisfy it. 551 U.S. 142, 155–56 (2007). Similarly, in discussing *Watson*, the Tenth Circuit described "[w]artime production" of a chemical, complete with "detailed specifications concerning the make-up, packaging, and delivery," as the "paradigmatic example for this special relationship." *Suncor*, 25 F.4th at 1252–53 (quoting *Winters v. Diamond Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998)).

Snap's relationships with the FDA and DHS fall far short. Snap gave high-level input about the direction of the campaigns, but that input reflects Snap's role as an autonomous, independent collaborator—not as a private entity under "strict guidance or control." For example, Snap sent DHS [redacted] SNAP-KSAG-00002435 (Ex. 2). Someone acting under "strict guidance or control" does not call the shots about which idea to develop. *Suncor*, 25 F.4th at 1253. As further confirmation that Snap was not "acting under" a federal superior, [redacted] (DHS's third-party marketing agency) had to ask Snap [redacted] SNAP-KSAG-00005396 (Ex. 3). Likewise, for Pledge2Protect, a Snap employee explained to a DHS employee that [redacted] SNAP-KSAG-00013817 (Ex. 4). And with the research that Snap agreed to provide DHS, Snap suggested research questions, SNAP-KSAG-00003655 (Ex. 5), which DHS lightly edited. SNAP-KSAG-00003676 (Ex. 6); SNAP-KSAG-00003679, at -679–81 (Ex. 7). Far from a private firm under "compulsion to provide the product to the government's specifications," *Suncor*, 25 F.4th at 1252

(quoting *Winters*, 149 F.3d at 400), Snap had significant autonomy and independence in its relationships with DHS and the FDA.

Although Snap paints itself as a purveyor of bespoke advertisements, DE23:2, 4, 8, Snap was largely a bystander to the third parties who hammered out the details. Snap's communications with DHS and the FDA show that Snap simply connected the third-party marketing agencies working with the FDA and DHS (i.e., [redacted]) with third-party ad developers (i.e., [redacted]), so those third parties—not Snap—could develop ads for the federal government. SNAP-KSAG-00004199, at -230 (Ex. 8) (Snap introduces [redacted]); SNAP-KSAG-00007935, at -7935–8038 (Ex. 9) ([redacted] develop the FDA's Real Cost campaign); SNAP-KSAG-00010879, at -913–917 (Ex. 10) (Snap connects [redacted] for the Real Nightmare); SNAP-KSAG-00012804, at -809 (Ex. 11) (DHS asks [redacted] for additional projects). Indeed, the timeline for the Know2Protect lens project [redacted]. SNAP-KSAG-00004199, at -229–30 (Ex. 8). Similarly, as of April 2024, as part of a "DHS x Snap – Quick Intro + Advertising Walk Through," [redacted] shared with Snap "two examples of the ads we are creating," suggesting that much of the development was complete before Snap became involved. SNAP-KSAG-00001881 (Ex. 12). Another email from a Snap employee to a [redacted] employee explained how to upload the lens to Snapchat once [redacted] "ha[d] the design finalized." SNAP-KSAG-00012417 (Ex. 13). And for the FDA's Real Cost campaign, [redacted]. SNAP-KSAG-00010879, at -903, -906 (Ex. 10).

Although actions of the third-party ad developers should not be imputed to Snap, those third parties also exercised independence not in keeping with "strict guidance or control." To start,

Snap is mistaken in arguing that the use of subcontractors does not change the analysis. DE23:10. The Fourth Circuit decision on which Snap relies merely explained that a subcontractor may act under a federal officer even in the "absence of privity of contract" with the federal government if the "nature of the relationship" between the subcontractor and federal officer satisfies the acting-under requirement. *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021). The Fourth Circuit neither held that the relationship between a subcontractor and federal officer could be imputed to a general contractor nor absolved subcontractors from satisfying the demanding standard that applies to any private person invoking federal-officer jurisdiction. In any event, the third-party ad developers to which Snap connected DHS and the FDA had substantial autonomy to tell the federal government's marketing agencies "no." For example, [redacted] SNAP-KSAG-00010879, at -899 (Ex. 10), and [redacted] *id.* at -881. Similarly, emails between [redacted] and Snap employees indicate that "ultimately the lens vendor has creative freedom" and "flexibility on the design." SNAP-KSAG-00008963, at -964, -966 (Ex. 14). So even if the actions of third-party ad developers were imputed to Snap, those third parties were not subject to "strict guidance or control" either.

Snap also cannot carry its burden by saying that it places advertisements where the FDA and DHS want. DE23:8. Rather than taking directions about ad placement, Snap was the one recommending [redacted] SNAP-KSAG-00015041, at -041–43 (Ex. 15); *see also* SNAP-KSAG-00014443 (Ex. 16). Those recommendations included a suggestion that [redacted] SNAP-KSAG-00013654 (Ex. 17). That

"auction occurs every time there is an opportunity to show an ad to a Snapchatter," and "[a]fter the ad enters the auction, it competes with other ads aimed at people with the same target audience." SNAP-KSAG-00013655, at -657 (Ex. 18). According to Snap, the "winning ad is the ad that we believe drives the most value to the overall platform." *Id.* So Snap, not the federal agencies, was ultimately in charge of ad placement. And the "Auto-Bid" strategy that [redacted] cedes even more control to Snap because it "allows Snapchat to set the bid on your behalf." *Id.* at -658. Yet again, instead of working under "strict guidance or control," Snap treated the federal government like any other advertising customer.

This evidence confirms what was already apparent from the terms of Snap's agreements with the federal agencies: Snap was not acting under either agency. To be clear, this Court need not hold that common-law agency is required to reach that conclusion; it need only recognize that courts frequently compare the kind of relationship that satisfies the acting-under requirement to the principal-agent relationship, *see, e.g.*, *Watson*, 551 U.S. at 156; *DeFiore v. SOC LLC*, 85 F.4th 546, 554 (9th Cir. 2023); *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756 (9th Cir. 2022), and also recognize that this evidence and the terms of Snap's agreements, which were at times tentative and aspirational, with the FDA and DHS fall far short. *See* DE11-2:12 (disclaiming "any agency, partnership or joint venture between you and Snap"); DE11-3:4 (requiring Snap only to "[e]xplor[e]" research and a campaign lens); DE11-3:6 (not "creat[ing] any legal obligation on the part of either party").

For these reasons, the Attorney General respectfully requests that this Court grant his motion to remand.

Dated: April 10, 2026

Respectfully submitted,

/s/ *Paul Shipp*
Paul Shipp (KS #20263)
Assistant Attorney General
Office of the Attorney General
Public Protection Division
120 SW 10th Ave., 2nd Floor
Topeka, Kansas 66612-1597
Tel: 785-296-3751
Fax: 785-291-3699
paul.shipp@ag.ks.gov

David H. Thompson*
Brian W. Barnes*
Megan M. Wold*
Jack Tucker*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com
jtucker@cooperkirk.com

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States District Court for the District of Kansas by using the appellate CM/ECF system on April 10, 2026. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: April 10, 2026

/s/ *Paul Shipp*
Attorney for Plaintiff