**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| STATE OF KANSAS, *ex rel.* KRIS W. KOBACH, Attorney General,<br><br>Plaintiff,<br><br>v.<br><br>SNAP INC.,<br><br>Defendant. | Case No. 5:25-cv-04109-DDC-GEB |

**DEFENDANT SNAP INC.'S SUR-REPLY TO THE STATE'S MOTION TO REMAND**

To minimize Snap's role in promoting public health and safety initiatives on behalf of the federal government, the State's Reply in Support of Motion to Remand (Dkt. No. 45) (the "Reply") offers a view of the federal officer removal statute's "acting under" requirement that is unsupported by law.[1] The State also misconstrues records it cherry-picked from the jurisdictional discovery Snap produced, ignoring the myriad communications reflecting DHS and the FDA's detailed guidance and directions to Snap for executing the agencies' research, advertisements, and Lenses. In fact, the evidence demonstrates just how integral and impactful Snap's role was in assisting the government with key statutory duties. As DHS's Know2Protect campaign director and support team noted, "Snapchat continues to be the Know2Protect campaign's most effective platform to engage directly with teens age 13 – 17" and DHS's "partnership with Snap has been the signal [*sic*] most significant force multiplier for Pledge2Protect." Ex. 1, Atkinson Decl.; Ex. 2 at -14878, -14880. Moreover, the sheer extent of the fact record establishes Snap's robust communication with the government and contractors working on its behalf.[2] In an attempt to overcome this evidence of close supervision, the State scrutinizes minor details of the communications, surmising about the implications and wording of certain messages. But even if such nuances could be determinative of this Court's jurisdiction (they are not), the State has failed to identify any that weaken Snap's federal officer removal arguments.

[1] Perhaps to divert attention from weaknesses in its arguments concerning the "connection or association" requirement of the federal officer removal statute, the State focused its Reply solely on the statute's "acting under" requirement. Snap's Sur-reply therefore also focuses on that requirement. Snap maintains that it has satisfied the statute's other requirements, and the State's neglect of them in its Reply is telling. Pursuant to the Court's April 22, 2026 Order (Dkt. No. 49), Snap will submit a supplemental brief addressing the import of *Chevron USA Inc. v. Plaquemines Par.*, No. 24-813, 2026 WL 1040461 (U.S. Apr. 17, 2026) on the federal officer removal arguments in this case, including as to the "connection or association" requirement addressed in the State's opening brief but disregarded in its Reply.

[2] Snap's work for DHS and the FDA goes far beyond work conducted for just "any other advertising customer." Reply at 5. Not only does Snap provide DHS with significant advertising grants and custom research, but Snap meets regularly with the agencies and/or their media partners to discuss the advertising campaigns. *See, e.g.*, Reply Ex. 11 at -12804; Ex. 3. In any event, the State has provided no support for the notion that a private entity only "acts under" a federal agency if the government provides closer supervision than others who contract for the entity's services.

It is well established that the "acting under" requirement is "broad" and "liberally construed," *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007), not the "high bar" the State suggests, Reply at 1. Snap's work on federal public education campaigns readily satisfies this requirement because—as shown through the jurisdictional discovery and the DHS Memoranda of Understanding and FDA campaign briefs Snap submitted with its Opposition—its work is subject to "strict guidance or control" and helps "carry out the duties or tasks" of federal agencies. *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022).[3] For the reasons described below, the State's attempt to mine for documents it could misconstrue as undermining the agencies' "close supervision" of their ad campaigns fails. *See id.* at 1252. The State's Motion to Remand should be denied.[4]

First, the record demonstrates consistent and detailed guidance to Snap and its vendors from the federal agencies and marketing agencies acting on their behalf.[5] *See, e.g.*, Ex. 4 at -15556, -15560 (detailed guidance on design of a The Real Cost ("TRC") Lens, including from FDA's Center for Tobacco Products ("CTP")); Ex. 5 (same, sent by FDA's marketing agency); Ex. 6 at -10108, -10111, -10114, -10117 (consolidated feedback on a TRC Lens); Reply Ex. 3 at -5404, -5412 (specific guidance on Know2Protect Lens design); Ex. 7 (creative brief submitted by DHS's contractor with extensive guidance on concepts, messaging, and branding for Know2Protect Lens).

Second, Snap, its vendors, and the marketing agencies are required to comply with the government's specific guidance, and many steps in the development of these ad campaigns require

[3] The State's comparison to *Watson* is inapposite. The defendant in *Watson* was not "acting under" the federal government because it merely complied with regulations and did not help the government "produce an item that it needs" or help fulfill "basic government tasks." 551 U.S. at 153. Here, Snap's actions were taken pursuant to contracts to help DHS and the FDA conduct their statutorily required public safety and health messaging.

[4] In filing this Sur-reply, Snap does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

[5] As reflected in these documents, DHS has contracted with [redacted]; the FDA has worked with marketing agencies such as [redacted]; and Snap has worked with vendors such as [redacted] on the Snapchat campaigns at issue.

approval from DHS and the FDA. *See, e.g.*, Reply Ex. 10 at -10895 (referencing need for CTP's approval of features); Reply Ex. 9 at -7939, -7958, -7963, -7972, -7983 (discussing feedback and needed approvals from FDA, including "leadership"). For example, during the development of a TRC Lens, the FDA's agency waited to share materials with Snap until receiving the FDA's approval. Reply Ex. 14 at -8968. The agency then sent Snap "detailed" guidance and stated that next steps involved getting the FDA's approval of "the look and feel of the lens" down to minor details like font. *Id.* at -8966.[6] The State's contrary arguments that the marketing agencies and developers act independently rely on pure conjecture, *see* Reply at 3 & Ex. 13 (arguing that DHS bore no responsibility for finalizing a Lens design because its marketing agency noted action would be taken "once we have our design finalized"), and ignore evidence of Snap's active role, *see, e.g.*, Reply at 3 & Ex. 10 at -10895-10898 (suggesting Snap [redacted]).

Third, and consistent with the above, the federal agencies have ultimate control over their ads, even though they understandably seek—and Snap provides—recommendations on issues such as "feasibility from a technical standpoint," [redacted] and which options [redacted] Reply Ex. 10 at -10900, -10908. Under the State's theory, where only muted facilitators who passively implement the government's explicit instructions "act under" the government, this level of engagement would be disqualifying. But that approach confuses participation with control and is refuted by the record here. For example, one email concerning a TRC Lens shows that, although Snap suggested certain concepts, the FDA and its

[6] Although Snap's Lens developer had some flexibility over certain aspects of the Lens, *see* Reply at 4, the government still dictated what those aspects were and retained ultimate control.

agency decided which to pursue. *Id.* at -10895, -10898; *see also* Reply Ex. 9 at -7983, -7986 (FDA rejecting creative suggestion from Snap's Lens developer).

The State's own exhibits also show that DHS indisputably retained control over the research Snap conducts for DHS, notwithstanding that Snap proposed a handful of initial questions to support the research.[7] *See* Reply at 2. DHS selected the final list of questions and chose how to phrase them, with multiple DHS officials revising Snap's initial proposal. *See* Reply Ex. 6 at -3676. DHS's revisions were significant, including detailed line edits and the addition of several new questions. *Compare id.* at -3678, *with* Reply Ex. 7. Similarly, Snap's contributions to questions DHS drafted for the Know2Protect Lens do not indicate that DHS lacked control over the campaign. *Contra* Reply at 2. The correspondence shows instead that DHS provided a style guide and list of questions to be shared with Snap's Lens developer, Reply Ex. 3 at -5417, which then proposed for DHS approval [redacted] *Id.* at -5413, -5415. DHS then provided a "revised list" of questions. *Id.* at -5408; Ex. 8.[8] Again, DHS retained ultimate control over the content Snap promoted on its behalf and directed the precise language to include. Snap was therefore under "compulsion to provide the product to the government's specifications." *Suncor*, 25 F.4th at 1252. In any event, the State offers no authority to suggest that Snap cannot satisfy the "acting under" requirement because some of the government's specifications may have adopted elements of recommendations by Snap or its subcontractors. And the State identified no evidence to suggest that Snap could implement its suggestions without approval from the federal agencies or those authorized to act on their behalf.

[7] Snap's proposed questions were "just some prompts to get the creative juices flowing," for which Snap sought DHS's "preferred language" and approval. Reply Ex. 6.

[8] This revised list of questions is the same list that Snap later sent back to DHS in response to its inquiry [redacted]. *See* Ex. 9; Ex. 10.

Finally, as Snap's webpage makes clear, the agencies, not Snap, "have control over where [their] ads appear on Snapchat with a variety of different placement options." Ex. 11 at -15125. This is confirmed by the record. *See, e.g.*, Ex. 12 (depicting placement options for the agencies to select); Ex. 13 (DHS's placement selections for 2024 and 2025 Know2Protect and Pledge2Protect ads); Ex. 14 (FDA's placement selections for 2024 and 2025 TRC ads). The agencies can customize the placement of their ads or select "Automatic Placement," which runs "ads across all of Snapchat," including in Stories, Spotlight, and Discover, Ex. 11 at -15125. They also dictate what age groups and geographic populations are targeted by their ads, Exs. 13 & 14, and, in many cases, whether their ads will be shown "near content that may have sensitive themes." Ex. 15 at -15133; Exs. 12 & 13 (showing the agencies' "brand suitability" selections).

Notably, the State confuses the evidence produced by Snap concerning ad "bidding" with ad "placement." *See* Reply at 4–5. Bids relate to pricing for Snapchat ads, Ex. 16, and impact an ad's performance in the Snapchat auction system that determines which ads are shown to which users, Ex. 17. Bids and bidding strategies do not impact ad placement (*i.e.*, which surfaces of Snapchat the ads are shown on). Moreover, the State's Exhibit 17 merely shows Snap recommending a bidding strategy for a DHS ad campaign. The decision of which bidding strategy was ultimately implemented remained with DHS and its contractor. And even where the government selects to allow Snap to set bids on its behalf, this auto-bidding strategy is informed by the government's "budget and target audience." Ex. 18.

For the foregoing reasons and those stated in Snap's Opposition, this Court should deny the State's Motion to Remand.

DATED: April 24, 2026

Respectfully submitted,

By: /s/ *Brian C. Fries*

Brian C. Fries (KS #15889)
Carrie E. Josserand (KS #18893)
Timothy J. Hadachek (KSD # 79038)
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108-2618
Tel: (816) 292-2000
brian.fries@lathropgpm.com
carrie.josserand@lathropgpm.com
timothy.hadachek@lathropgpm.com

Edward D. Greim (KS #21077)
Paul E. Brothers (KS #26863)
Matthew R. Mueller (KS #28499)
Katherine E. Mitra (KS #79151)
GRAVES GARRETT GREIM LLP
1100 Main Street, Suite 2700
Kansas City, Mo64105
Tel: (816) 256-3181
edgreim@gravesgarrett.com
pbrothers@gravesgarrett.com
mmueller@gravesgarrett.com
kmitra@gravesgarrett.com

Jeannie S. Rhee (admitted *pro hac vice*)
L. Rush Atkinson (admitted *pro hac vice*)
Kyle Smith (admitted *pro hac vice*)
Elizabeth N. Brandt (admitted *pro hac vice*)
DUNN ISAACSON RHEE LLP
401 Ninth Street, NW
Washington, D.C. 20004-2637
Tel: (202) 240-2900
jrhee@dirllp.com
ratkinson@dirllp.com
ksmith@dirllp.com
ebrandt@dirllp.com

Christine M. Ray (admitted *pro hac vice*)
DUNN ISAACSON RHEE LLP
11 Park Place
New York, NY 10007
Tel: (212) 470-1306
cray@dirllp.com

*Attorneys for Defendant Snap Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Brian C. Fries*
Brian C. Fries
An Attorney for Defendant